Gary SOUTIERE, Janet Soutiere, Wesley Frost and Martha Frost, Plaintiffs,

v.

BETZDEARBORN, INC. and Ashland Chemical, Inc., Defendants.

No. CIV.A. 299CV299.

United States District Court, D. Vermont.

Jan. 29, 2002.

Robert B. Hemley, Esq., Gravel and Shea, Burlington, H. Joseph Gamache, Winooski, for Gary Soutiere, Janet Soutiere, Wesley Frost, Martha Frost, plaintiffs.

James W. Spink, Esq., Elizabeth Hawkins Miller, Esq., Spink & Miller, PLC, Burlington, John J. Zawistoski, Esq., Ryan, Smith & Carbine Ltd., Rutland, Donald E. Frechette, Esq., Edwards & Angell, LLP, Hartford, CT, Andrew P. Fishkin, Esq., Edwards & Angell, LLP, New York, NY, Kenneth J. Cesta, Esq., Edwards & Angell, LLP, Short Hills, NJ, W. Kyle Carpenter, Esq., Woolf, McClane, Bright, Allen & Carpenter, PLLC, Knoxville, TN, for Betzdearborn, Inc., Ashland Chemical, Inc., defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

Plaintiffs Gary Soutiere and Wesley Frost together with their spouses brought this action in strict liability, breach of warranty and negligence, claiming that they sustained neurological injury from their use of and exposure to polyacrylamide flocculents in the course of their employment at the IBM manufacturing facility in Essex Junction, Vermont. Defendants Betz-Dearborn Inc. ("Betz") and Ashland Inc. ("Ashland"),[1] manufacturers and distributors of the flocculent, have jointly moved for summary judgment on the ground that the applicable statute of limitations bars Plaintiffs' claims. For the reasons that follow, Defendants' motion is denied.

### Factual Background

For the purpose of deciding this motion, the following facts are undisputed. Gary Soutiere and Wesley Frost were co-workers at IBM in its industrial wastewater treatment plant. In the course of their employment they handled an acrylamide polymer flocculent, a substance used to remove heavy metals and other contaminants from wastewater. Flocculents made of acrylamide polymer will always contain a small amount of residual acrylamide monomer. Acrylamide monomer is neurotoxic and carcinogenic, and exposure to large amounts can result in severe injury or death.

The flocculent, a powder, was stored in barrels or bags. In the course of their work, Frost and Soutiere would open the bags or barrels, handle the powder, mix it

---

1. Ashland appears in the caption of the complaint as Ashland Chemical.

with water, and clean out machinery and pipes that frequently became clogged with a mix of water and flocculent. Introducing the flocculent, or polymer, into the system generated considerable dust, and any contact with moisture produced an oily slime. The floor in the polymer work area usually had a film of water on it because the drains frequently clogged.

Neither Frost nor Soutiere was advised of any potential health hazards associated with exposure to acrylamide monomer, and they took no precautions when handling the flocculent or working around it. As they emptied the bags, mixed the polymer and cleared the pipes, their faces, hands, eyes and lungs were exposed to the substance. As Soutiere put it, they "lived and breathed that stuff for years." Soutiere Dep. v. II at 57 (Doc. 69, Ex. A).

In 1985 Frost began to experience severe pain in his left foot. In 1986 he started feeling the same pain in his right foot. Over the next two years the pain migrated through his arms, hips and legs. His health declined; by 1986 he had difficulty climbing stairs. By 1988 to 1989, Frost was taking morphine for pain and using crutches much of the time. He was found to be totally disabled for purposes of disability insurance benefits as of April 1993.

Soutiere began experiencing severe pain in his feet in the first half of 1990. His symptoms also worsened, and he received a determination of total disability as of

July 1996. Both men had been diagnosed with peripheral neuropathy [2] by 1993.

Based on discussions that he had with Frost when his symptoms began, Soutiere believed that he and Frost were suffering from the same problem, and that it stemmed from something they were exposed to in their workplace. Soutiere decided to investigate, and he shared the information he obtained with Frost as he learned it. Frost is a high school graduate. Soutiere has a GED, the equivalent of a high school education.

Soutiere considered possible causes for their neuropathy, including the heavy metals in the influent coming from manufacturing, the concentrated waste system, and the domestic waste system. He discussed these possibilities with medical professionals and with IBM management. He initially had no suspicion that an ingredient in the polyacrylamide flocculent might be the cause.

Following the onset of his symptoms, Soutiere was seen regularly by IBM doctor Douglas Weir, and in November 1993 he and Frost were interviewed by Dr. Franklin Aldrich from IBM's Center for Process and Product Toxicology. At about the time of the November interviews Dr. Weir mentioned acrylamide to Soutiere and told him that acrylamide could cause neuropathy. Whether Soutiere understood or believed from this conversation that acrylamide had caused his neuropathy is disputed by the parties.[3] Soutiere then

2. Peripheral neuropathy is a general term indicating a disorder of peripheral nerves. An individual with peripheral neuropathy may suffer deficits in sensory, motor, reflex, or vasomotor function, or a combination of these. Peripheral neuropathies can be caused by medical conditions, mechanical stressors, drugs, and occupational or environmental toxins. See Trout letter dated October 6, 1995 (Doc. 69, Ex. Q).

3. Soutiere testified in deposition that "[t]he only one that mentioned [acrylamide] was Dr. Weir, and ... he said the only thing that could cause—that's causing your problem was the acrylamide, and that was the first time I've heard the word acrylamide, even though I worked with it.... When Dr. Weir at IBM mentioned the only thing that could cause the neuropathy that you have right now is the acrylamide, and I says, 'Well, I'm not familiar with acrylamide.' He said, 'Yeah.

researched acrylamide in a medical library, and believed that what he read about the effects of exposure paralleled his own symptoms.

Dr. Aldrich evaluated the possibility that Soutiere's and Frost's neuropathies were caused by toxic exposure in their workplace. He noted that the acrylamide monomer in the flocculent was the most probable toxin, but that estimated exposure was infinitesimal, and that a toxic cause for their syndrome was "uncertain." Aldrich letter dated 9 November 1993 (Doc. 69, Ex. C).

In 1994, Soutiere filed a complaint with the state under the Vermont Occupational Safety and Health Act ("VOSHA") in which he stated that he and two colleagues had been exposed to toxic chemicals. A VOSHA investigator told Soutiere in 1995 that acrylamide was a likely cause of their neuropathy, but he could not document their exposure. Soutiere reviewed the VOSHA file in Montpelier, Vermont and read a publication containing a discussion of acrylamide's toxicity. The document stated, in pertinent part, "[a]crylamide may be absorbed through the skin or by inhalation. Workers exposed to the dust for 4 to 12 weeks showed symptoms of muscular weakness particularly in the legs, numbness of the limbs, absence of deep tendon reflex, fatigue, and lethargy." Doc. 69, Ex. H. Soutiere believed that he was experiencing these symptoms.

On August 14, 1995 Soutiere wrote to Dr. Douglas Trout of the National Institute for Occupational Safety and Health ("NIOSH"). He summarized his efforts to identify a chemical responsible for the neuropathy, stating that he was unable to, although he continued to focus on acrylamide monomer. Dr. Trout conducted a health hazard evaluation and reported that Soutiere's and Frost's symptoms were "not typical manifestations of acrylamide or other toxic neuropathies." Trout report dated October 6, 1995 (Doc. 69, Ex. Q).

On December 13, 1995 Soutiere wrote to Dr. Rup Tandan, a neurologist, in connection with his attempt to obtain workers' compensation. He stated: "I believe I can show that acrylamide monomer in our polymer is the very likely cause of my neuropathy." Doc. 87, Ex. GG. In the same letter he characterized his activities as an ongoing quest to identify the neurotoxin that caused his neuropathy. Dr. Tandan noted that he told Soutiere that it would be impossible to prove a cause and effect relationship between any one chemical and his "painful syndrome." Tandan notes dated June 25, 1996 (Doc. 78, Ex. 18).

In January 1996 Soutiere applied to the Commissioner of Vermont's Department of Labor and Industry ("DOL") for a hearing to adjudicate his claim for workers' compensation. At issue, Soutiere stated, was "[e]xposure through the 1980's and early 1990's to acrylamide monomer in our anionic polymer, used as a coagulant in treating industrial waste water. Acrylamide monomer is a cumulative neurotoxin." Notice dated January 27, 1996 (Doc. 69, Ex. J). In February Soutiere wrote a lengthy letter to a Workers' Compensation Specialist at DOL detailing his efforts to uncover the cause of his neuropathy, his discovery that acrylamide monomer was a neurotoxin, and his growing belief that exposure to acrylamide was responsible for his condition.

In a May 1996 letter requesting medical surveillance by the Environmental Protec-

It's in your polymer." ' Soutiere Dep. v. II at 51, 57 (Doc. 69, Ex. A). He testified further, "Dr. Weir just stated that this [acrylamide] is there in the polymer.... He did not say that that was the cause." *Id.* at 77, 726 A.2d 61.

tion Agency, Soutiere detailed his concerns about acrylamide, but concluded by stating that he was still trying to identify chemicals that could have caused his neuropathy.

Also in May of 1996 Dr. Weir noted in Soutiere's medical records that Soutiere continued to be concerned about all chemicals, and that he had no identifiable exposure to any known neurotoxic chemicals and minimal exposure to chemicals in general. IBM continued to maintain to Soutiere that acrylamide monomer was not present in the flocculent or was present in only minute amounts.

On August 25, 1996, in an interview form connected with his application for social security disability benefits, Soutiere stated: "[m]y injury is caused from a cumulative exposure to a neurotoxin called acrylamide monomer which causes motor and sensory nerve damage, numbness to lower limbs, inability to write or lift feet when walking or climbing stairs and more." Doc. 69, Ex. N.

On October 26, 1996, Soutiere asked IBM for a chemical list showing the identity and quantity of polymers used at the IBM Waste Treatment Plant. In deposition he testified: "I still had strong—. . . even though people were saying, "Well, sorry, Gary, we don't think it is it," IBM said, "Boy, we don't think it is it," and doctors said, "Boy, we're not sure," I still had strong suspicions, so, still, my quest was still the polymer." Soutiere Dep. v. IV at 111 (Doc. 69, Ex. K).

The medical notes of neurologist Dr. Leland Scott from April 8, 1997 reflect that he diagnosed Frost with "peripheral neuropathy likely secondary to acrolomide [sic]." Doc. 78, Ex. 12. Dr. Scott's medical notes from September 8, 1998 reflect that he diagnosed Soutiere with "small fiber neuropathy probably caused by chronic exposure to acrylamide monomer." *Id.*

In deposition Soutiere testified several times over the course of three days of questioning, from defense counsel as well as his own counsel, that he did not actually know that he suffered from neuropathy due to acrylamide exposure until he received a diagnosis from Dr. Scott. He said that he didn't stop searching for sources of the neuropathy until Dr. Scott told him that acrylamide was responsible.

Soutiere stated his belief that IBM should have warned them about the danger of acrylamide monomer, that is if IBM had been told of its hazards by their suppliers. Soutiere also stated that he had no idea before the filing of this lawsuit what Betz or Ashland knew or should have known about the toxic nature of acrylamide polymer.

Soutiere shared his suspicions about and his research into acrylamide with Frost. Frost agreed that it was around November of 1994 that Soutiere told him he thought the polymer system, or the acrylamide monomer, could be creating the problem. Soutiere also told Frost about Dr. Weir's remarks concerning acrylamide. Soutiere told Frost that he was looking at everything in the waste treatment system, but that when the VOSHA inspector told Soutiere that acrylamide monomer was a neurotoxin, Soutiere's attention focused on that.

Frost felt by 1995 or 1996, having been through considerable testing for causes of his illness, that Soutiere's information about acrylamide "was just another thing, maybe, okay." Frost Dep. v. III at 31 (Doc. 69, Ex. B). Frost stated that it was only in 1997 that he and Soutiere learned what their problem was, when Dr. Scott told them of a connection. Before then, Frost stated that he had no idea what was going on.

Soutiere and Frost believe that the flocculent was the only neurotoxin to which they were exposed at IBM. They knew that the flocculent was supplied by Betz and by Ashland's Drew Division because the bags or barrels were labeled. They both were familiar with the precautions that should be taken when handling toxic or otherwise hazardous chemicals, and knew that chemical manufacturers supplied Material Safety Data Sheets ("MSDSs") for every potentially hazardous chemical distributed. The waste treatment plant workers consulted the MSDSs when a spill occurred, but did not read them for each product they used. However Soutiere knew at the latest by May 1996 that no warning concerning acrylamide monomer appeared on Betz's or Ashland's MSDSs for the polymer.

Soutiere and Frost brought suit against Betz and Ashland on October 5, 1999. Betz and Ashland contend that summary judgment on their claims is appropriate because the undisputed facts demonstrate that Soutiere's and Frost's claims accrued more than three years prior to the date of their Complaint.

## Discussion

### I. Legal Standards

Summary judgment should be granted when "there is no genuine issue as to any material fact, and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This rule places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). When a motion for summary judg-

ment is made and so supported, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

"A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' and [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Goldberg v. Cablevision Sys. Corp.,* 261 F.3d 318, 324 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Summary judgment is also mandated against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

In ruling on a motion for summary judgment "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. It is not the court's function to make credibility determinations, weigh evidence, or draw inferences from the facts. *Id.*

The Court, sitting in diversity jurisdiction, applies the law of the forum state to the determination of whether the applicable statute of limitations bars this action. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also Barquin v. Roman Catholic Diocese*

*of Burlington, Vt., Inc.*, 839 F.Supp. 275, 278–79 (D.Vt.1993).

## II. *The Applicable Statute of Limitations*

Under Vermont law, the limitations period applicable to a given claim depends upon the nature of the harm suffered. *See Fitzgerald v. Congleton*, 155 Vt. 283, 288, 583 A.2d 595, 598 (1990). In this suit, the Plaintiffs assert personal injury claims for nerve damage attributed to exposure to acrylamide monomer. The Defendants state that the general three-year statute of limitations for personal injury applies in this case. *See* Vt. Stat. Ann. tit. 12, § 512(4) (Supp.2001).[4] The Plaintiffs suggest that their claims are subject to the three-year statute of limitations that governs "injury from . . . noxious agents medically recognized as having a prolonged latent development." Vt. Stat. Ann. tit. 12, § 518(a) (1973).[5] Under either statute of course Plaintiffs had three years from the date their cause of action accrued in which to file their suit. *See Cavanaugh v. Abbott Labs.*, 145 Vt. 516, 527, 496 A.2d 154, 161 (1985).

In *Cavanaugh*, the Vermont Supreme Court reiterated that where a general and a specific statute of limitations are both applicable to a single cause of action the specific statute of limitations shall apply. *Id.*, 145 Vt. at 528, 496 A.2d at 161. Although one might readily assume that Soutiere and Frost's injuries took some time to develop, the complaint as amended does not allege that these injuries were medically recognized as having a prolonged latent development.[6] *See Mauran v. Mary Fletcher Hosp.*, 318 F.Supp. 297, 299 (D.Vt.1970). Accordingly, the Court applies the general statute of limitations for personal injury cases, § 512(4), in this case.

## III. *The Discovery Rule*

In addition to setting forth a three-year limitation period, § 512(4) provides that "the cause of action shall be deemed to accrue as of the date of the discovery of the injury." § 512(4). The Vermont Supreme Court has established a uniform means for determining the time of accrual, designed to be consistent with the discovery rules adopted by the legislature in §§ 512(4) and 518(a). *See Cavanaugh*, 145 Vt. at 526, 496 A.2d at 160–61. *See also Earle v. State*, 170 Vt. 183, 192, 743 A.2d 1101, 1108 n. 6 (1999); *Univ. of Vt. v. W.R. Grace & Co.*, 152 Vt. 287, 290, 565 A.2d 1354, 1357 (1989). In *Cavanaugh*, the plaintiff filed within three years of the date of discovery of her injury. The Court

4. Section 512(4) provides:
 Actions for the following causes shall be commenced within three years after the cause of action accrues, and not after: . . . (4) Except as otherwise provided in this chapter, injuries to the person suffered by the act or default of another person, provided that the cause of action shall be deemed to accrue as of the date of the discovery of the injury[.]
 Vt. Stat. Ann. tit. 12, § 512(4) (Supp.2001).

5. Section 518(a) provides:
 An action to recover for ionizing radiation injury or injury from other noxious agents medically recognized as having a prolonged latent development shall be commenced within three years after the person suffering the injury has knowledge or ought reasonably to have knowledge of having suffered the injury and of the cause thereof, but in no event more than twenty years from the date of the last occurrence to which the injury is attributed.
 Vt. Stat. Ann. tit. 12, § 518(a) (1973).

6. The First Amended Complaint does allege that Soutiere and Frost's injuries resulted from significant daily exposure over a period of years, and that chronic exposure caused extensive and irreversible neurological damage. From these allegations of chronic *exposure* however one must speculate that their injuries had a prolonged latent development.

therefore did not then decide whether discovery of the injury alone was sufficient for accrual, or whether there must be discovery of the injury plus its cause. *Cavanaugh,* 145 Vt. at 526, 496 A.2d at 160 n7.

In a medical malpractice action construing a different statute of limitations, § 521, the Court stated that it was deciding the issue left open in *Cavanaugh. See Lillicrap v. Martin,* 156 Vt. 165, 173, 591 A.2d 41, 45 (1989). In *Lillicrap,* the Court held that a statute of limitations begins to run " 'only when a plaintiff discovers or reasonably should discover the injury, its cause, and the existence of a cause of action.' " *Id.,* 156 Vt. at 176, 591 A.2d at 47 (quoting *Ware v. Gifford Memorial Hosp.,* 664 F.Supp. 169, 171 (D.Vt.1987)).

The *Lillicrap* rule is not confined to medical malpractice actions. In *Earle,* the Vermont Supreme Court emphasized that it has attempted to unify the definition of accrual in statute of limitations cases involving personal injury. *See Earle,* 170 Vt. at 192, 743 A.2d at 1108 n. 6. The Court there held that for "whichever statute of limitations [§ 512 or § 522] is ultimately determined to govern," *id.,* 170 Vt. at 192, 743 A.2d at 1107, "[t]he date of accrual under the statute of limitations seeks to identify the point at which a plaintiff should have discovered the basic elements of a cause of action: an injury caused by the negligence or breach of duty of a particular defendant." *Id.,* 170 Vt. at 193, 743 A.2d at 1108. *See also Leo v. Hillman,* 164 Vt. 94, 98, 665 A.2d 572, 575 (1995) ("accrue" should be given uniform meaning); *Lillicrap,* 156 Vt. at 172, 591 A.2d at 45.

Following the mandate of the Vermont Supreme Court that the determination of accrual dates in personal injury suits should be uniform, this Court applies the *Lillicrap* standard to the determination of the accrual date under § 512(4): the point at which the Plaintiffs should have discovered (1) their injury; (2) its cause; and (3) the existence of a cause of action. If the Plaintiffs' causes of action accrued before October 5, 1996, their suit is time-barred.

Plaintiffs do not dispute that they were aware of their injuries well before 1996. Remaining at issue are when Soutiere and Frost knew or should have known the cause of their injuries, and when they knew or should have known of the existence of a cause of action, in other words, that the Defendants had breached a duty or otherwise engaged in wrongdoing.

### A. Causation

In a typical accident tort action, the injury, its cause and the wrongdoing are easy to identify and to pinpoint in time. In a toxic tort case the connection between chemical exposure and a physical condition is not at all obvious. Determining the etiology of the disease may be "fraught with difficulty, uncertainty, and error." Michael D. Green, *The Paradox of Statutes of Limitations in Toxic Substances Litigation,* 76 Cal. L.Rev. 965, 983 (1988). Indeed, at trial, expert testimony would be essential to a finding of causation. *See e.g., Graham v. Canadian Nat. Ry.,* 749 F.Supp. 1300, 1318 (D.Vt.1990).

The facts of this case illustrate the difficulty of identifying the time by which Soutiere and Frost knew or reasonably should have known the cause of their injuries. Soutiere's suspicions were aroused as early as November of 1993, when Dr. Weir told him of the toxicity of acrylamide. Nevertheless, despite his repeated efforts to get someone to validate his suspicions, every expert he consulted, both medical and scientific, either rejected his theory or found it "uncertain" at best, until Dr. Scott's diagnosis. Soutiere remained open to the possibility that something other than Betz and Ashland's acrylamide flocculent was

causing the neuropathy as late as October 26, 1996, when he requested a list from IBM of the identity of all polymers used at the Waste Treatment Plant. He has sworn that he didn't actually know that the acrylamide monomer was the cause until Dr. Scott made his diagnosis. Nevertheless, from late 1993 on Soutiere concentrated on acrylamide, and in August 1996 in connection with his application for disability benefits, Soutiere claimed that the cause of his neuropathy was acrylamide monomer.

 Whereas the facts relevant to the statute of limitations defense are essentially undisputed, the inference to be drawn from these facts concerning Soutiere's knowledge of his injury's cause is not so clear. As the Second Circuit Court of Appeals reminds: "[i]t is not the province of the court itself to decide what inferences should be drawn; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000) (citations omitted). In determining whether an individual had knowledge, the underlying facts are merely the starting point for an assessment of the inferences to be drawn from the objective facts and their significance. This assessment is appropriately one for the trier of fact. Only if reasonable minds cannot differ on the question of knowledge should the issue be determined as a matter of law. *See, e.g., Vispisiano v. Ashland Chem. Co.*, 107 N.J. 416, 527 A.2d 66, 74 (1987) (reversing trial court's determination that action was time-barred, state supreme court took issue not with facts but with significance to be attached to them). Until Dr. Scott's diagnosis, Soutiere's "knowledge" could be viewed as unsubstantiated suspicion, however strong and however forcefully expressed.

In cases such as this one, some courts have adopted a rule requiring some objective verification of a causal connection between injury and toxic exposure, holding that a diligent plaintiff's suspicion or subjective belief is insufficient to establish accrual, although acknowledging that medical certainty or a definitive diagnosis is not necessary. *See Childs v. Haussecker*, 974 S.W.2d 31, 43 (Tex.1998). *See also Hildebrandt v. Allied Corp.*, 839 F.2d 396, 399 (8th Cir.1987) (unconfirmed or rejected suspicions insufficient, construing Minnesota law); *Williams v. Borden, Inc.*, 637 F.2d 731, 735 (10th Cir.1980) (medical uncertainty re link between injury and occupational exposure to allegedly harmful product defeated summary judgment, construing Oklahoma law); *Stoleson v. United States*, 629 F.2d 1265, 1270–71 (7th Cir. 1980) (suspicion ripened into knowledge, triggering statute of limitations, upon medical confirmation, construing federal law); *In re Asbestos Litig.*, 673 A.2d 159, 164 (Del.1996) (subjective belief, absent medical diagnostic support, did not establish accrual); *Baysinger v. Schmid Prods. Co.*, 307 Md. 361, 514 A.2d 1, 4 (1986) (suspicions plus investigation plus inconclusive medical opinions did not trigger accrual as a matter of law); *Vispisiano*, 527 A.2d at 76 (necessity for reasonable medical information before plaintiff deemed to have requisite knowledge for accrual); *Borello v. U.S. Oil Co.*, 130 Wis.2d 397, 388 N.W.2d 140, 146 (1986) (lay person's subjective belief, when cause and effect relationship not readily apparent, does not effect accrual).

There are policy as well as practical reasons for adopting an objective confirmation rule in complex causation cases. It would be an odd sort of justice for plaintiffs' suits to be time-barred solely based

on their subjective convictions that toxic chemical exposure caused their illnesses, and for their suits to be barred from jury consideration solely because their subjective convictions were insufficient proof of causation. Plaintiffs are faced with the Hobson's choice of filing lawsuits prematurely, before they have adequate admissible evidence of causation, or risking dismissals on statute of limitations grounds. Moreover, the difficulty of identifying the point on a continuum when a plaintiff's suspicion has ripened into knowledge would be reduced or eliminated by focusing instead on the more readily ascertainable time when a plaintiff received some objective confirmation of that suspicion.

A Seventh Circuit Court of Appeals panel has held in a toxic exposure case construing Indiana's discovery rule:

> where knowledge of causation is at issue, a person knows or should have discovered the cause of his injury when he has or should have discovered some evidence that there was a reasonable possibility that his injury was caused by the act or product of another. A reasonable possibility, while less than a probability, requires more than the mere suspicion possessed by ... a layperson without technical or medical knowledge.

*Evenson v. Osmose Wood Preserving Co. of Am., Inc.*, 899 F.2d 701, 705 (7th Cir. 1990). *Evenson* involved a wood treatment worker who alleged injuries caused by exposure to chromated copper arsenate. Reversing a grant of summary judgment for defendants, the Court stressed the fact that the plaintiff, despite diligent effort, had been unable to obtain any medical support to confirm his suspicion as to the cause of his injury prior to the statutory period. *Id.*, at 704. *See also Allied Resin Corp. v. Waltz*, 574 N.E.2d 913, 915 (Ind. 1991) (doctor's testimony that he told plaintiff his symptoms were "possibly caused" by exposure did not trigger accrual).

There is some indication that the Vermont Supreme Court would adopt an objective support rule in toxic exposure cases. In *Rodrigue v. VALCO Enterp., Inc.* the Court cited *Graham*, 749 F.Supp. at 1317, a toxic exposure case, with approval for the proposition that a claim did not accrue under Vermont law until plaintiffs had *valid* reason to suspect the cause of their injuries. *Rodrigue v. VALCO*, 169 Vt. 539, 540, 726 A.2d 61, 63 (1999) (emphasis supplied).

It is unnecessary for the disposition of this motion to employ such a rule, however. On a motion for summary judgment, all reasonable inferences to be drawn from the underlying facts must be viewed in the light most favorable to a nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Lillicrap*, 156 Vt. at 172–73, 591 A.2d at 45. Of course, if the evidence is so one-sided that only a moving party may prevail, summary judgment is appropriate. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

■ On the current state of the record, this Court cannot say as a matter of law that the only legitimate inference to be drawn from the facts is that Soutiere knew or should have known the cause of his injury before October 5, 1996. Although several courts have held that an application for disability benefits that states toxic exposure as the cause of injury is conclusive on the issue of a claimant's knowledge, *see, e.g., In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1285, 1289 (E.D.N.Y.

1985), *aff'd in part, vacated in part* 818 F.2d 210 (2d Cir.1987); *Lapka v. Porter Hayden Co.*, 162 N.J. 545, 745 A.2d 525, 530 (2000); *Meeker v. Am. Torque Rod of Ohio, Inc.*, 79 Ohio App.3d 514, 607 N.E.2d 874, 877–78 (1992), other courts have held that the significance of statements on a disability application concerning causation are for the trier of fact to weigh. "Rather than demonstrating what a plaintiff actually knows or should have known, an occupational injury claim ... may be filed by an overly cautious plaintiff merely because of that layperson's unfounded suspicions or belief that an injury is related to a particular exposure." *Childs*, 974 S.W.2d at 42–43. *See also Biesterfeld v. Asbestos Corp. of Am.*, 467 N.W.2d 730, 739 (N.D.1991). Soutiere's belief, manifested in his disability application and his persistent communications with state and federal officials, may not necessarily amount to knowledge.

In a similar case involving toxic exposure resulting in peripheral neuropathy, a trial court's decision to let the issue of plaintiff's knowledge be decided by a jury was affirmed. In *Salazar v. Am. Sterilizer Co.*, 5 P.3d 357 (Colo.Ct.App.2000), a technician who had been exposed to ethylene oxide, a neurotoxin, from use of a hospital sterilizer, sued the manufacturer, who claimed that the applicable statute of limitations barred the suit. The technician knew of her injury, her exposure to the chemical and its source outside the statutory period, but had only equivocal medical support for her causation contention at that point. Colorado's discovery rule is similar to that of Vermont: "the statute of limitations begins to run when the claimant has knowledge of facts which would put a reasonable person on notice of the nature and extent of an injury and that the injury was caused by the wrongful conduct of another." *Id.*, 5 P.3d at 363. The appeals court rejected the contention that inquiry notice, the possibility of a claim,

triggered accrual under the discovery rule, and concluded that the issue of the plaintiff's knowledge was properly submitted to the jury. *Id.*

Assessing an individual's state of mind is a classic task for the factfinder, all the more so because the nature and number of those facts that will constitute "knowledge" will vary with the circumstances of each case. *See Vispisiano*, 527 A.2d at 76. *See also Evenson*, 899 F.2d at 705 (inquiry into whether person knew or should have known the cause of injury is fact-specific); *Allied Resin*, 574 N.E.2d at 915 (fact-sensitive question as to when plaintiff should have discovered causal connection between injury and exposure required resolution by jury). *See also* Green, 76 Calif. L.Rev. at 983 (necessary to submit issue of plaintiff's knowledge to jury, precluding resolution of statute of limitations issue at early stage of litigation). If any evidence "fairly and reasonably" supports a claim, the issue should go to the jury. *Lillicrap*, 156 Vt. at 173, 591 A.2d at 45 (quoting *Senesac v. Assocs. in Obstetrics & Gynecology*, 141 Vt. 310, 312, 449 A.2d 900, 902 (1982)). Soutiere has pointed to evidence from which a reasonable factfinder could conclude that he did not know, nor should he reasonably have known, the cause of his injury until Dr. Scott's diagnosis, within the statute of limitations period.

The evidence of record supporting Frost's knowledge is comparatively scanty. Betz and Ashland rely heavily on Soutiere's statements that he kept Frost informed over the course of his investigation. They stress that Frost admitted that Soutiere told him he thought their condition was due to acrylamide monomer sometime in 1995. Frost also swore, however, that he did not know the cause of his injury until Dr. Scott's diagnosis. On this evidence, a reasonable factfinder could readily conclude that Frost did not know, nor

should he reasonably have known, the cause of his injury until Dr. Scott's diagnosis.

### B. *Cause of Action*

Although it is not necessary to the disposition of this motion, because the issue may arise at trial the Court addresses the third component of the *Lillicrap* rule: when Soutiere and Frost discovered or should have discovered the existence of a cause of action. *See Lillicrap*, 156 Vt. at 166, 591 A.2d at 46 at In the personal injury context, the Vermont Supreme Court has expounded on this portion of the rule in a pair of cases: *Rodrigue v. VALCO Enterp.*, 169 Vt. 539, 726 A.2d 61 (1999) (entry order) and *Earle v. State*, 170 Vt. 183, 743 A.2d 1101 (1999).

■ In *Rodrigue*, the Court wrote: "[t]he courts must determine at what point a plaintiff had information, or should have obtained information, sufficient to put a reasonable person on notice that a particular defendant may have been liable for the plaintiff's injuries." *Rodrigue*, 169 Vt. at 540–41, 726 A.2d at 63. *See also Earle*, 170 Vt. at 193, 743 A.2d at 1108. Thus, "the limitations period begins to run 'when the plaintiff has or should have discovered both the injury and the fact that it *may* have been caused by the defendant's negligence or other breach of duty.'" *Rodrigue*, 169 Vt. at 541, 726 A.2d at 63 (quoting *Lillicrap*, 156 Vt. at 175, 591 A.2d at 46 (emphasis added)).

*Rodrigue* involved a dram shop suit brought by a motorist injured by a drunk driver against the business which served the driver. The plaintiff claimed that his cause of action did not accrue until he knew that the driver had been overserved at the establishment. The Court disagreed: once "the plaintiff knew of his injury, knew the driver who caused it and knew the driver had been drinking at the

defendant's establishment, then he was on sufficient notice to pursue the defendant." *Earle*, 170 Vt. at 193, 743 A.2d at 1108 (citing *Rodrigue*, 169 Vt. at 540, 726 A.2d at 63–64). In the absence of disputed material facts, summary judgment was appropriate. *Rodrigue*, 169 Vt. at 541, 726 A.2d at 64.

The Vermont Supreme Court, applying *Rodrigue*'s holding, emphasized that "a cause of action accrues when a plaintiff discovers that a *particular defendant* may have breached a duty" in *Earle v. State*. *Earle*, 170 Vt. at 193, 743 A.2d at 1108. *Earle* involved a suit against the Department of Social and Rehabilitation Services ("SRS") claiming that its negligence allowed the plaintiff to be sexually abused by an older boy in SRS custody. The Court focused on when the plaintiff would have had reason to suspect that SRS owed him a duty, explaining that "absent the information that SRS knew about the abuse, there was little more than bold speculation that SRS had any responsibility for plaintiff's injuries." *Id.* It distinguished *Rodrigue* on its facts, noting that in *Earle*'s circumstances, "the existence of any duty at all was not apparent to plaintiff at the time his injuries were inflicted." *Id.*

The Plaintiffs have alleged in their complaint as amended that the Defendants are liable both for the manufacture and distribution of a dangerously defective product and for failure to warn of its health hazards. In addition, they have brought a strict liability claim against Betz for misrepresentation.

■ Soutiere and Frost knew at the time of their employment that purveyors of hazardous materials must warn their customers about those hazards. They knew that chemical suppliers communicated warnings about their products through MSDSs kept on file at IBM. They knew

that they were using Betz and Ashland products. They knew by 1993 that the polymer they were using contained acrylamide monomer. They knew that acrylamide monomer was neurotoxic and carcinogenic by 1995 if not sooner.[7] Once they learned or should have learned the cause of their injuries, they already were on notice of all of the remaining elements of a cause of action against the Defendants.[8]

The Plaintiffs have argued that they did not know or have reason to know that they had a potential cause of action before October 5, 1996 because they did not then know or have reason to know that Betz and Ashland knew or had reason to know of monomer's hazards, thereby giving rise to a duty to warn. They contend that the *Lillicrap* language predicating accrual upon discovery of the existence of a cause of action means ascertaining that one's legal rights have in fact been violated. *See* Pls.' Mem. in Opp'n at 14–16 (Doc. 77); Pls.' Sur–Reply Br. at 2–3 (Doc. 91). This reads too much into *Lillicrap*. The case law has never required more than the " 'discovery of *facts* constituting the basis of a cause of action or the existence of *facts* sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.' " *Galfetti v. Berg, Carmolli & Kent Real Estate Corp.*, 171 Vt. 523, 756 A.2d 1229, 1231 (2000) (entry order) (quoting *Vermont Agency of Nat. Res. v. Towns*, 168 Vt. 449, 452, 724 A.2d 1022, 1024 (1998) (citations omitted)) (emphasis supplied).

*Earle* is not to the contrary. The plaintiff in that case had no reason to suspect that SRS owed him any sort of duty until he was able to learn that SRS had been informed of the abuse of him by a child in its custody. He therefore had no reason to suspect that he had a cause of action against SRS until that time, which was not apparent from the record. *See Earle*, 170 Vt. at 193, 743 A.2d at 1108. By contrast, once Soutiere and Frost learned or should have learned of the nature and cause of their injuries, they were also already in possession of sufficient additional facts to put them on notice that Betz and Ashland had engaged in wrongdoing. *See Galfetti*, 756 A.2d at 1231 (plaintiff on notice of all facts that could have been obtained by exercise of reasonable diligence). As the Vermont Supreme Court explained: "[t]he plaintiff need not have an airtight case before the limitations period begins to run. Fleshing out the facts will occur during investigation of the matter or during discovery after the lawsuit is filed." *Rodrigue*, 169 Vt. at 541, 726 A.2d at 63.

### CONCLUSION

Because precisely when Soutiere and Frost's causes of action accrued will require factual development concerning when they knew or reasonably should have known the cause of their injuries, summary judgment at this stage is inappropriate. Betz and Ashland's Joint Motion for Summary Judgment (Doc. 67) is accordingly DENIED.

---

**7.** Soutiere also knew by May 1996 that there were no warnings for acrylamide monomer on the MSDSs.

**8.** Even if, *arguendo*, the Plaintiffs could not reasonably have discovered that Betz had allegedly misrepresented its product as non-hazardous until they learned fairly recently that Betz had long known of acrylamide monomer's hazards (the basis for Count I of their complaint as amended), the Plaintiffs are not entitled to a later accrual date. Each count merely represents a different theory of recovery for the Defendants' alleged wrongdoing.