2013 VT 52

**Jamie Clarke v. Joseph Abate, M.D.**

[80 A.3d 578]

No. 12-229

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed August 9, 2013

*Michael I. Green* and *Jerome F. O'Neill* of *O'Neill Kellner & Green,* Burlington, for Plaintiff-Appellant.

*Ian P. Carleton* and *Eric S. Miller* of *Sheehey Furlong & Behm P.C.,* Burlington, for Defendant-Appellee.

¶ 1. **Reiber, C.J.** In this civil action alleging sexual assault and battery and intentional or reckless infliction of emotional distress by a medical doctor during the course of his treatment of a high school female athlete, plaintiff appeals the superior court's grant of summary judgment to defendant based on the six-year statute of limitations applicable to childhood sexual abuse. The court's determination that the limitations period had run as a matter of law before plaintiff filed her lawsuit relied primarily on plaintiff's statements to police and her deposition testimony concerning her awareness of defendant's wrongful conduct at the time of the alleged assaults. We conclude that the court erred by determining the limitations accrual date as a matter of law rather than allowing the jury to weigh inferences from the factual record regarding plaintiff's state of mind and knowledge during the relevant period of time. Accordingly, we reverse the judgment and remand the matter for further proceedings consistent with this opinion.

¶ 2. The facts, viewed most favorably to plaintiff, are as follows. See *Southwick v. City of Rutland,* 2011 VT 53, ¶ 4, 190 Vt. 106, 35 A.3d 113 ("We review an award of summary judgment de novo, construing all doubts and inferences in favor of the nonmoving party."). Plaintiff became a patient of defendant, who was an orthopedic surgeon and a professor at the University of Vermont medical school, in September 2000, a few months after her

sixteenth birthday. Plaintiff had suffered a hip injury while training for her high school soccer season, and her pediatrician referred her to defendant, whose office notes indicate that she had groin pain near the pubic area.

¶ 3. After several visits, defendant told plaintiff that her parents did not need to accompany her to appointments, which eventually took place on a weekly basis, sometimes after hours without any record of them occurring. Defendant convinced plaintiff that he was the only doctor able and willing to treat her complicated medical problems. In late 2001, plaintiff began babysitting for defendant at her mother's suggestion, and, as a result, plaintiff developed a close relationship with defendant and his family.

¶ 4. Defendant performed two surgeries on plaintiff, the first in March 2001 and the second in July 2002. On at least three occasions during the course of his treatment of plaintiff, including one time before her first surgery and another time before her second surgery, defendant inserted his ungloved fingers into plaintiff's vagina. No one other than defendant and plaintiff was present on these occasions. Defendant insists that these vaginal penetrations were legitimate medical internal examinations conducted for diagnostic purposes. In fact, in his deposition testimony, he stated that he believed his intra-vaginal examinations of plaintiff had led him to the brink of discovering the source of her groin pain. Plaintiff's treatment with defendant ended in August 2002.

¶ 5. In June 2007, defendant was arrested and criminally charged with sexually assaulting another patient in a similar manner. Defendant's arrest was highly publicized, and the media reports describing his alleged conduct towards some patients — convincing parents not to attend office visits, seeing patients during after-hours visits, not wearing gloves during vaginal examinations, and holding himself out as the only doctor capable of addressing the patients' problems, for example — reminded plaintiff of her own experiences while being treated by defendant. Encouraged by her discovery that other women had come forward, plaintiff responded to a police request for former patients to provide any information related to the charges against defendant.

¶ 6. Plaintiff filed her civil suit against defendant on June 4, 2009. Defendant moved for summary judgment on the basis that the lawsuit was barred by the applicable statute of limitations. The trial court granted the motion, relying primarily on state-

ments made by plaintiff to police in 2007 and her 2011 deposition testimony concerning her awareness of defendant's conduct at the time of the alleged assaults. The court acknowledged that juries generally determine statute-of-limitations accrual dates, but nevertheless concluded as a matter of law that plaintiff's cause of action began to accrue when she reached the age of majority because her "own statements indicate that she immediately recognized the tortious nature of [defendant's] conduct." More specifically, the court stated that plaintiff knew or should have known of the assaultive nature of defendant's conduct at the time it occurred because of: (1) the manner of the examinations in question; (2) the nonprofessional and inappropriate relationship that defendant fostered with her; and (3) "most importantly," her previous statements related to her awareness of defendant's wrongful conduct at the time of the suspect examinations.

¶ 7. On appeal, plaintiff argues that the trial court erred in granting defendant summary judgment by: (1) construing facts favorably to defendant rather than her; and (2) concluding that the statute of limitations could not be tolled based on a theory of fraudulent concealment.

■ ¶ 8. The parties and the trial court agree that the applicable statute of limitations is found in 12 V.S.A. § 522(a), which states as follows:

> A civil action brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within six years of the act alleged to have caused the injury or condition, *or six years of the time the victim discovered that the injury or condition was caused by that act,* whichever period expires later.

(Emphasis added.) The Legislature's insertion of the underlined clause indicates its adoption of the discovery rule in determining the limitations period for bringing actions concerning childhood sexual abuse. See *Earle v. State*, 170 Vt. 183, 192, 743 A.2d 1101, 1107 (1999) ("The Legislature's use of 'discover' in § 522 builds upon the case law developed for physical injuries and the so-called 'discovery rule.'"); see also *Soutiere v. Betzdearborn, Inc.*, 189 F. Supp. 2d 183, 190 (D. Vt. 2002) (noting that this Court in *Earle* "emphasized that it has attempted to unify the definition of accrual in statute of limitations cases involving personal injury").

¶ 9. Our discovery-rule case law construing the statute has established that "a cause does not accrue for physical injuries ["or condition" 12 V.S.A. § 522(a)] until those injuries reasonably should be discovered." *Earle*, 170 Vt. at 192, 743 A.2d at 1108. Thus, "[t]he date of accrual under the statute of limitations seeks to identify the point at which a plaintiff should have discovered the basic elements of a cause of action: an injury caused by the negligence or breach of duty of a particular defendant." *Id.* at 193, 743 A.2d at 1108; see *Lillicrap v. Martin*, 156 Vt. 165, 175, 591 A.2d 41, 46 (1989) (noting "clear trend" among courts holding that limitations period does not begin to run "until the plaintiff has discovered his 'legal injury,' such that the statute begins to run only when the plaintiff has or should have discovered both the injury and the fact that it may have been caused by the defendant's negligence or other breach of duty").

¶ 10. We have repeatedly and consistently emphasized that the question of when an injury reasonably should have been discovered "is one of fact to be determined by the jury." *Lillicrap*, 156 Vt. at 172, 591 A.2d at 44; see *Turner v. Roman Catholic Diocese of Burlington, Vt.*, 2009 VT 101, ¶ 48, 186 Vt. 396, 987 A.2d 960 (citing *Agency of Natural Res. v. Towns*, 168 Vt. 449, 454, 724 A.2d 1022, 1025 (1998), for proposition that "the determination of when a claim accrues is generally a question reserved for the trier of fact"); see also *Riley v. Presnell*, 565 N.E.2d 780, 787 (Mass. 1991) (citing "majority of jurisdictions" holding "that factual disputes concerning when a plaintiff knew or should have known of his cause of action are to be resolved by the jury"). Hence, the court rather than the jury may determine the accrual-date issue only "when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue." *Turner*, 2009 VT 101, ¶ 48; see *Lillicrap*, 156 Vt. at 173, 591 A.2d at 45 (stating that "such questions are 'to be determined in all doubtful cases by the jury, because the public insists that its conduct be judged in part by the [person] in the street rather than by lawyers'" (quoting Prosser and Keeton on the Law of Torts § 37, at 237 (5th ed. 1984))); cf. *Rodrigue v. VALCO Enters., Inc.*, 169 Vt. 539, 540-41, 726 A.2d 61, 63-64 (1999) (mem.) (concluding as matter of law that limitations period had run with respect to plaintiff's dram shop action where there was evidence showing plaintiff knew from police investigation that driver who had rear-ended him had been drinking at defendant's

establishment on evening of accident, that driver had been charged with careless and negligent operation due to driving while intoxicated, and that more details would be ·provided in police report, which turned out to strongly suggest that defendant had overserved driver intoxicating liquor that evening).

¶ 11. As noted, the trial court provided three reasons to support its conclusion that the limitations period began to run as a matter of law when plaintiff reached the age of majority shortly after the last of the alleged assaults occurred. The three reasons were all directed at the central question of whether plaintiff knew or should have known at the time of the alleged assaults that her longtime doctor's digital vaginal penetrations, done ostensibly in connection with the doctor's treatment for her ongoing hip/groin injuries, were assaultive in nature rather than legitimate medical examinations.

¶ 12. The trial court cited as the principal basis for its decision statements made by plaintiff in a 2007 police interview and a 2011 deposition concerning her awareness of possible wrongdoing on defendant's part with respect to the vaginal examinations. In her 2007 interview with police, which occurred in the context of an ongoing criminal investigation against defendant, she told police about the examinations that caused her concern. The court found statements in the following dialog supportive of its decision:

> Q: [D]uring your visits with [defendant] was there ever anything that concerned you?
>
> A: Um, yeah, definitely. . . . I mean just like his — his facial expressions and he would like perspire a lot and while he was examining me and that's all I can like remember is like just his facial expressions just like he scared me. . . . Like he was enjoying it . . . .
>
> . . . .
>
> This is so — it's so hard because you're like — when you're in there, you're — you're like on your, you know, you're on your guard and you're like — like this — this should not be happening and —
>
> . . . .

Q: And what was he — how was he touching you? Well, what was he doing? Like when he was doing this, what is he saying to you?

A: Nothing. It's all like facial — facial expressions and —

. . . .

Q: I mean — but how is he touching you though? I mean how — how —

A: Well, I mean I guess in a way someone would examine you but I don't think it got like — I just don't know. . . . I don't — it was — I felt like there was a difference. There was definitely like a line where it went from, you know, him really examining me to like him finding pleasure out of it.

Q: Well, talk to me about that. I don't understand what you mean.

A: Um, just things like — it was just like the aura like just the feeling in the room the — his facial expressions changed, um, like he was kind of like — like nervous in a way, um, like he was perspiring and definitely — it was a definite feeling. It was different. It was definitely different.

Q: Different than what you had experienced before?

A: Right and then like him examining . . . versus him kind of taking it to the next level where he — it really wasn't examining anymore. It was more like him just finding — it was more like gratifying to him than it was to me.

. . . .

Q: At any point did you ever talk to him about it?

A: No. . . . I guess I hoped that my facial expressions would have said everything but —

Q: So what do you mean by that? Talk about that. I mean so did — did he know that you were uncomfortable with it?

A: I'm — I'm not sure.

. . . .

Q: Who — who did you tell or who did you mention it to?

A: Um, I just kind of like, you know, mentioned it to my mom and — . . . . Um, my sister and I don't know I — I kind of like told some of my friends like kind of — I was just kind of seeing what other people would say if I told them because I really wasn't like sure. I don't know. I was just like in a state of mind that I just didn't know. . . .

Q: Well, what did — what did they say to you? Did anybody make any recommendations to you?

A: Um, like my friends were like, "Oh, that's, you know, that's weird like that shouldn't be happening." And I was like, "Yeah, really. It really shouldn't."

. . . .

Q: Was there anything else that happened with you with him that you were concerned about during the examinations, um —

A: After my surgery?

Q: After your surgery?

A: Um, yes, he, um, I don't — I don't remember how like it started or — or anything. I just — I remember him, um, just like putting his fingers in my vagina. . . . And not like in an examining way either.

. . . .

Q: Okay, was — okay, so, um, what did he — did he — he didn't say he was going to do anything then? Or you don't remember I am sorry?

A: I don't recall.

Q: I am sorry. So what did, uh, how long did that go on for?

A: Not very long because I think he was — he was startled by me in that I jumped back and, um, but I mean I remember it being a couple of minutes.

Q: Okay and do you remember what he was doing? Do you remember specifically what physically — you just mentioned physically [what] he was doing?

A: Um, it was — I mean just moving his fingers in and out. It wasn't — it was — it wasn't — he definitely wasn't examining. He wasn't doing pressure or anything. . . . Like while he was doing this he was like watching like my facial expression.

Q: Okay and did he say anything? Make any comment to you?

A: No.

. . . .

Q: Now if you knew it was [not] okay, why didn't you tell the — tell the authorities?

A: Because I believed him. I believed that he was the only one that would — would spend this time and, um, you know, he stuck around for this long like he — he was invested in, you know, my injury and, um, you know, he was willing to — to research it and, you know, talk to different doctors and, um, yeah, I guess that's — that was — I guess I was just more concerned about getting better than — . . . . [a]nything else because I was in so much pain. . . . And I was so young and —

Q: Yeah, okay —

A: Um, and that's a horrible excuse.

¶ 13. Without question, a reasonable juror might infer from plaintiff's statements to police that she had sufficient knowledge at the time of the incidents in question to understand that defendant's conduct was wrongful and not medically necessary. But, on the other hand, these statements do not demonstrate such knowledge on her part as a matter of law. Examining the statements most favorably to plaintiff, a reasonable juror could infer that plaintiff was "on [her] guard" as a teenaged girl having her male doctor examine her in a sensitive and private area of her body, and that although she had a "definite feeling" that the doctor was satisfying his sexual desires during certain examinations, she could not confirm those feelings because she "believed" defendant, and her family did not react to her concerns about her treatment with him.

¶ 14. At one point during the police interview, plaintiff stated: "And I felt like I could trust him. I mean he's my doctor. . . . [H]e has done surgery on me and I just kind of . . . [u]m, I trusted him I guess." She also stated that she went to her mother and sister about her concerns to see what they would say because she was "in a state of mind that [she] just didn't know." Thus, although plaintiff, in the context of making a statement to criminal investigators, indicated she "definitely" felt something was wrong during the examinations, she also made statements indicating that she was not sure if her concerns were valid and did not receive affirmation of the validity of those concerns from family members. Indeed, in a July 2008 deposition taken at the Chittenden County State's Attorney's Office, she indicated that she had hinted to her mom and sister about what was happening but they did not react at all, so she "assumed it was fine." She further stated that, "I feel like he definitely used his power over me to make me feel like this was okay and he was my doctor and he knew what — what was supposed to be going on."

¶ 15. Given plaintiff's at-times equivocating and conflicting statements to the authorities concerning her knowledge and awareness of any wrongful conduct on defendant's part, it was the jury's prerogative to make any inferences from those statements and determine at what point plaintiff knew or should have known that defendant's conduct was assaultive rather than medical in nature. See *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d

Cir. 2000) ("It is not the province of the court itself to decide what inferences should be drawn; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." (citations omitted)).

¶ 16. The same can be said with respect to the statements made by plaintiff during her 2011 deposition testimony and also relied upon by the trial court in granting defendant's motion for summary judgment. The trial court and defendant rely on the following statements from that deposition:

> Q: So before you spoke with your friends at college, had you spoken to any member of your family about concerns that you had with respect to [defendant's] treatment of you?
>
> A: Yeah, I think it was like — very, like, subtle things I would tell them. I would tell my mom or my sister . . . just. . . . [l]ike, [defendant] was, like, rubbing my legs after an exam. . . . They didn't really respond in any alerting way, so I guess that's normal.
>
> Q: So were you bringing it up to them for — because you thought it was wrong or because you were looking to see if they thought it was wrong?
>
> A: I guess I always knew it was wrong in my heart. I really need —
>
> Q: You mean since — since it happened?
>
> A: Yeah. I just kind of wanted to feel like it was justified by someone, someone older than me, someone that I trusted, and that's why I, you know, did mention it to them on various occasions of strange things that, I don't know, a normal person wouldn't think was okay.
>
> Q: So if you knew it was wrong in your heart, why were you looking for an older person to justify it?
>
> A: I was young. I was very young. I was very naive. I was very sheltered as a child. I guess I had trouble being — believing in myself. Had some, like, self-esteem issues.

Q: So even though you had some trouble believing in yourself, you — like you said before, in your heart you knew it was wrong?

A: Yes.

Q: From the time that it happened?

A: Yes.

. . . .

Q: Let's — let's go back to your discussing these matters with your friends at — at UVM. It sounds like periodically the topic of [defendant] would come up with — with friends at UVM and your friends would make comments like, That's really weird and not appropriate — or something like that.

A: Yes.

Q: And — that validated your — your own personal feelings about the inappropriateness of the — of the — of the medical attention.

A: Yes.

Q: Did any of those types of conversations take place in your junior or senior years; that is, further away from the time that you saw [defendant] and I take it after you stopped baby-sitting for him as well?

A: Not that I recall. . . .

. . . .

Q: You stopped seeing [defendant] in August of 2002. Do you recall why you stopped seeing [defendant]?

A: Yes

Q: Why is that?

A: Well, I had my surgery, and I was recovering, and I wasn't experiencing any pain. I didn't really want to be

around him any longer. I really didn't feel want to feel like I was being controlled or have to deal with that situation anymore. It was just kind of done. I was —

Q: So — so on some level your — physically your treatment had run its course; you had had the surgery — . . . . Is that correct?

A: Yes.

. . . .

Q: . . . . [W]hat led to your decision to — to come forward and speak with the authorities?

A: I knew in my heart that — I mean, there was a point where I knew that I couldn't — what was the point of coming forward? I didn't have any real evidence. I didn't keep track of the dates I was seen when he examined me after hours. I didn't keep track of the days that I baby-sat for him. I didn't keep track of the days that he came to my work. I didn't — I didn't have anything. I had my point of view vers[us] his, and that's all I had, and I felt for a long time like I didn't have enough to say, Look, this guy really did something to me, and I just thought it would go away.

I buried it a long time ago. After my mom and my sister didn't find any substance to what I was saying, I buried it. I was like, I'm — it's gone. It didn't happen. But until that — it came on the news and in the papers, I mean, what couldn't hurt to come forward and tell my story? Because other girls had experienced the same thing, but they had evidence and they had things that were substantial that I didn't have.

¶ 17. Defendant relies primarily on the plaintiff's statement that from the beginning she knew in her "heart" that what defendant had done to her was wrong. Taken in isolation, this statement might support the trial court's summary judgment ruling on the accrual date. But, once again, plaintiff's deposition testimony, taken as a whole, is equivocating and ambiguous as to whether she was sufficiently aware, or should have been aware, that defendant's acts were assaultive rather than therapeutic in nature.

¶ 18. Even the most damning statement itself expresses plaintiff's uncertainty as to what she knew about defendant's conduct: "*I guess* I always knew it was wrong in my heart." (Emphasis added.) She testified that she was "very young" and "very naive" and needed affirmation of her suspicions but did not get it from her family. She expressed an inability to believe in herself. Although she confirmed, when pressed by her interviewer, that she knew in her "heart" that defendant's conduct was wrong even though she had trouble believing in herself, the deposition testimony as a whole, just as in her interviews with authorities years earlier, reveals real uncertainties as to her knowledge of the wrongfulness of defendant's conduct.

¶ 19. Examining this testimony as a whole, a reasonable jury could conclude that even though plaintiff suspected that defendant had examined her to satisfy his sexual desires rather than treat her hip/groin injury, she did not and could not have reasonably discovered the alleged legal injury until she learned through media reports that defendant had been charged with assaulting other women in a similar manner. A reasonable jury could come to such a conclusion, considering the position of trust and authority established by defendant as plaintiff's longstanding doctor, the fact that plaintiff was being treated for an injury near an intimate part of her body, and the lack of a response from plaintiff's family affirming her vacillating concerns about defendant's methods of examination and treatment. Cf. *Doe v. Creighton*, 786 N.E.2d 1211, 1214 (Mass. 2003) (affirming summary judgment ruling on statute of limitations because plaintiff failed to submit additional evidence beyond fact that sexual abuse took place — such as "that the defendant made any attempt to cloak his actions behind a facade of normalcy or otherwise disguise the nature of the abuse"); *Riley*, 565 N.E.2d at 786 (concerning alleged abuse that defendant portrayed as therapeutic technique).

¶ 20. The trial court gave two other reasons for granting defendant summary judgment on the statute-of-limitations issue. First, the court stated that the manner of the vaginal examinations was "troubling." The court noted plaintiff's own deposition testimony indicating that the examinations were performed without warning, without latex gloves, and after hours in defendant's office with no one else present. Second, the court cited the inappropriate, nonprofessional relationship that defendant fostered with plaintiff, noting that defendant overpaid plaintiff for

babysitting, gave her access to his personal contact information, allowed her to drive his car, and made inappropriate comments to her about his family. The apparent reasoning here is that because defendant had established a personal relationship with plaintiff beyond the common professional doctor-patient relationship, and because orthopedic-related vaginal examinations were unusual, plaintiff should have known that her doctor was engaging in assaultive conduct rather than examining her for hip/groin injuries.

 ¶ 21. Essentially, the trial court made inferences favorable to defendant from the facts, even though plaintiff was the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that with regard to motion for summary judgment "all justifiable inferences are to be drawn in [the nonmoving party's] favor"). While for the most part the material facts in this case — facts as to what occurred during the examinations and what the parties stated in their deposition testimony — are undisputed, the inferences from those facts concerning plaintiff's knowledge and awareness of any wrongdoing on defendant's part are far less clear. "In determining whether an individual had knowledge, the underlying facts are merely the starting point for an assessment of the inferences to be drawn from the objective facts and their significance." *Soutiere*, 189 F. Supp. 2d at 191. The ultimate assessment of the inferences is for the jury rather than the court, unless reasonable minds could not differ on the question of knowledge. *Id.*

¶ 22. Here, reasonable minds could differ on whether the manner of the vaginal examinations and the closer relationship that had developed between defendant and plaintiff due in part to plaintiff babysitting for defendant's family should have made plaintiff aware of the assaultive nature of defendant's examinations. Jurors could certainly differ on the extent to which the teenaged plaintiff was or should have been aware of the irregularity of purported medical examinations by her orthopedic doctor, who was treating injuries through examinations involving the most intimate area of her body. Jurors could even infer that the close relationship between defendant and plaintiff established a level of trust that precluded plaintiff from affirming concerns she had about the examinations. Indeed, in his deposition testimony, plaintiff's expert testified that the close relationship between defendant, his family, and plaintiff made this "almost more of like

an incestuous type situation," which conceivably could influence a juror's belief as to whether plaintiff could be reasonably expected to believe that defendant had abused her during the examinations. Cf. *Evans v. Eckelman*, 265 Cal. Rptr. 605, 608 (Ct. App. 1990) (noting "widely recognized that the shock and confusion engendered by parental molestation" could cause delay in victim recognizing full impact of abusive acts).

¶ 23. Moreover, we reject defendant's suggestion that the trial court's decision can be supported by the fact that: (1) plaintiff stopped seeing defendant in August 2002, not long after the last of the suspect examinations; and (2) friends in whom she confided during her freshman and sophomore years in college thought that defendant's conduct was "really weird" and "not appropriate." Plaintiff made it clear in her deposition testimony that her primary reasons for not continuing treatment with defendant after August 2002 was that her surgery was over and she was not experiencing any pain. Indeed, she agreed that her "treatment had run its course." She also stated that she did not want to feel like she was being controlled by defendant, but that statement does not demonstrate her knowledge that his conduct was assaultive rather than therapeutic. It is merely another fact for the jury to weigh. Nor do the quoted comments of her friends support a ruling, as a matter of law, that plaintiff knew or should have known that defendant had assaulted her while purportedly treating her.

¶ 24. "Two common themes run through the cases applying the discovery rule of accrual," *id.* at 608, which "is essentially a rule of equity," *R.L. v. Voytac*, 971 A.2d 1074, 1082 (N.J. 2009) (quotation omitted). The first is that the rule often applies "to types of actions in which it will generally be difficult for plaintiffs to immediately detect or comprehend" the wrongful conduct or the injury caused by that conduct; the second is that "courts have relied on the nature of the relationship between defendant and plaintiff to explain application of the delayed accrual rule," and then generally applied the rule "to confidential or fiduciary relationships." *Evans*, 265 Cal. Rptr. at 608. Those themes reach their apex in a case such as this in which a doctor allegedly sexually assaults a minor patient while purportedly performing a medical examination for a longstanding injury in a private area of the patient's body. This is particularly true here, where defend-

ant's doctor-patient relationship with plaintiff evolved into a close personal relationship involving deeper levels of trust.

¶ 25. Given the imbalances of the roles between plaintiff and defendant, as well as the ambiguities and inconsistencies in the statements relied upon by the trial court with respect to the extent of plaintiff's knowledge and understanding of whether the purported treatment was in fact childhood sexual abuse, the trial court erred in dismissing plaintiff's suit as a matter of law. The jury should have been given the opportunity to weigh the inferences and nuances of plaintiff's statements and other evidence in determining the proper accrual date for the applicable statute of limitations. We are not persuaded otherwise by defendant's reliance on out-of-state cases with distinguishable facts and distinct law. See, e.g., *Baird v. Am. Med. Optics*, 713 A.2d 1019, 1025-26 (N.J. 1998) (concluding that statute of limitations began to run on plaintiff's medical malpractice and informed consent claims shortly after her cataract surgery when she was aware of her worse eyesight and was told about problems with surgery); *Rose v. Women's Health Clinic*, 630 N.E.2d 760, 762 (Ohio Ct. App. 1993) (concluding that when plaintiff learned she had cancer, "cognizable event" occurred, thereby triggering running of statute of limitations with respect to medical malpractice action alleging negligence in not informing her of pap smear test results).

¶ 26. Nor are we persuaded by defendant's arguments that the trial court's decision should be affirmed because: (1) plaintiff never disputed the facts defendant asserted in his summary judgment motion; and (2) plaintiff's attorney conceded at the hearing on his summary judgment motion that plaintiff had been on inquiry notice of her claims so as to bar her cause of action under the applicable statute of limitations. Regarding the first argument, defendant's reply to plaintiff's opposition to his motion for summary judgment included his contention that plaintiff had failed to contradict any of the facts contained in his memorandum of undisputed facts, including that she was immediately aware of the wrongfulness of defendant's examinations and the resulting injury. The trial court did not address this argument in its decision, and defendant renews it before this Court on appeal.

¶ 27. In making the argument, defendant relies upon a sentence in former V.R.C.P. 56(c)(2) — "All material facts set forth in the statement [of undisputed material facts] required to be served by the moving party will be deemed to be admitted unless contro-

verted by the statement required to be served by the opposing party."[*] Defendant asserts that plaintiff "never disputed any of the foregoing facts, all of which were set forth in" his statement of undisputed facts. Defendant does not indicate precisely what those facts were, but his statement of undisputed material facts in support of his motion for summary judgment quotes the very same statements by plaintiff that he claims, and the trial court ruled, entitled him to summary judgment based on plaintiff's concurrent acknowledgement of the wrongfulness of his conduct.

■■ ¶ 28. Defendant cannot prevail on grounds that plaintiff failed to challenge his statement of undisputed facts insofar as we have ruled herein that those statements were insufficient to support the trial court's summary judgment ruling in favor of defendant based on plaintiff's alleged acknowledgement of defendant's wrongful conduct. See *Milton Educ. & Support Ass'n v. Milton Bd. of Sch. Trs.*, 171 Vt. 64, 74-75, 759 A.2d 479, 486-87 (2000) (holding that labor board did not err in denying school board's motion for summary judgment, even though employee association filed no opposition to motion, because proffered facts were insufficient to warrant grant of summary judgment as matter of law). Plaintiff never conceded that she knew or should have known of the wrongfulness of defendant's conduct, which was the ultimate factual question for the jury to resolve in determining whether the statute of limitations had run. See 10B C. Wright, A.

---

[*] This sentence no longer exists in the current version of Rule 56. The sentence was deleted, effective January 23, 2012 — approximately six weeks after plaintiff responded to defendant's motion for summary judgment but several months before the court ruled on the motion — as part of an update of the rule to "clarify[ ] the substance and process for summary judgment and establish[ ] uniformity with the current federal rule." Reporter's Notes, 2012 Amendment, V.R.C.P. 56. The new rule states in relevant part that if a party fails to address another party's assertion of fact as required by 56(c), the court "may" give the party an opportunity to address the fact, consider the fact undisputed "for purposes of the motion," grant summary judgment if the motion and supporting materials warrant it, or "issue any other appropriate order." V.R.C.P. 56(e). The use of the word "may" under the new rule "means the court may choose not to consider the fact as undisputed, for example if the court knows of record materials that show grounds for genuine dispute." Reporter's Notes, 2012 Amendment, V.R.C.P. 56. Moreover, "[t]he phrase, 'for purposes of the motion,' clarifies that a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings." *Id.* Given our resolution of this issue, we need not consider whether the current version of Rule 56 clarified that the trial court has always had the discretion to consider a fact as disputed based upon an examination of the record.

Miller & M. Kane, Federal Practice and Procedure § 2738, at 346-56 (3d ed. 1998) ("[U]ltimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary-judgment motion."). The parties debated at the hearing on defendant's motion for summary judgment whether those statements demonstrated plaintiff's awareness of defendant's wrongful conduct, with plaintiff arguing that the statements were ambiguous and for the jury to construe. As discussed above, we agree it was for the jury to decipher the meaning of the statements.

¶ 29. Defendant's second argument is that plaintiff's counsel conceded at the hearing on his motion for summary judgment that plaintiff was on inquiry notice of the assault so as to preclude her lawsuit based on the applicable statute of limitations. At that hearing, the court asked plaintiff's counsel if he thought that plaintiff, by bringing her suspicions to the attention of her family, indicated her awareness that defendant's acts constituted a sexual assault and were not medical treatment. Plaintiff's counsel stated that it indicated only that she was questioning the appropriateness of defendant's conduct. By acknowledging, in response to the court's questioning, that plaintiff had concerns early on about the appropriateness of defendant's examinations, plaintiff's counsel did not concede that plaintiff had knowledge sufficient to trigger the running of the applicable statute of limitations, as explained above.

¶ 30. Finally, we address the issue of fraudulent concealment. Section 555 of Title 12 provides as follows: "When a person entitled to bring a personal action is prevented from so doing by the fraudulent concealment of the cause of such action by the person against whom it lies, the period prior to the discovery of such cause of action shall be excluded in determining the time limited for the commencement thereof." Plaintiff mentioned fraudulent concealment in her original complaint but then removed any mention of the term from her second amended complaint. In response to defendant's motion for summary judgment, she argued in part that defendant had fraudulently concealed plaintiff's potential cause of action by telling her that he was uniquely qualified to treat her and by suggesting to her that the allegedly assaultive examinations were part of his treatment for her injuries. The trial court rejected this argument in its decision, stating that a well-established defense to a claim of fraudulent concealment is that the plaintiff knew or should have known of the cause of action, which was the case here. See *Snyder v. Boy Scouts of*

*Am., Inc.*, 253 Cal. Rptr. 156, 159 (Ct. App. 1988) ("Where fraud is established the statute is tolled only for so long as the plaintiff remains justifiably ignorant of the facts upon which the cause of action depends; discovery or inquiry notice of the facts terminates the tolling.").

¶ 31. On appeal, plaintiff briefly repeats her fraudulent concealment claim. Defendant responds that: (1) as the trial court concluded, the claim is unavailable because even if there was fraud on his part, plaintiff did not rely upon the fraud but rather was aware, or should have been aware, of the cause of action; and (2) the claim is unavailable because plaintiff failed to plead it and first mentioned it only in response to plaintiff's motion for summary judgment.

¶ 32. As suggested by the trial court's ruling on this issue, any claim of fraudulent concealment is subsumed within the central preliminary question disputed by the parties, ruled on by the trial court, and to be considered by the jury on remand: Given all of the circumstances of this case — including defendant's conduct, his relationship with plaintiff, and the nature of the injury — at what point did plaintiff know, or should she have known, that defendant assaulted her while purportedly examining her? The jury's answer to that question will determine whether plaintiff may move forward with her lawsuit, irrespective of the existence of any fraud claim. Plaintiff may argue to the jury that defendant's actions, including those noted above, effectively precluded her from understanding that she had a cause of action against defendant, at least until criminal charges were filed against him in connection with alleged similar assaults against other women. We agree with defendant, however, that, to the extent plaintiff is asserting a claim of intentional fraud, she is foreclosed from pursing such a claim because she failed to plead it. See *Fercenia v. Guiduli*, 2003 VT 50, ¶ 15, 175 Vt. 541, 830 A.2d 55 (mem.) (declining to read medical malpractice negligence claim in complaint "as one of intentional fraud").

*Reversed and remanded for further proceedings consistent with this opinion.*