2013 VT 112

### Daniel Brown v. State of Vermont

[88 A.3d 402]

No. 12-337

Present: **Dooley, Skoglund, Burgess and Robinson, JJ., and Carroll, Supr. J., Specially Assigned**

Opinion Filed December 13, 2013

▬▬▬▬▬▬▬▬▬▬

---

*James G. Levins* of *Tepper Dardeck Levins & Gatos, LLP,* Rutland, for Plaintiff-Appellant.

*William H. Sorrell,* Attorney General, and *Jonathan T. Rose* and *David R. Groff,* Assistant Attorneys General, Montpelier, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiff Daniel Brown appeals from a superior court decision granting summary judgment in favor of the State on plaintiff's claim of employment discrimination in violation of the

Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4311. He contends that summary judgment was improper because genuine material issues of fact remained as to whether his membership in the Vermont National Guard was a motivating factor in the State's decisions not to promote him, and ultimately to terminate him from his position. We affirm.

¶ 2. The facts may be summarized as follows. In December 2008, the Vermont Department of Corrections (DOC) hired plaintiff as a Temporary Corrections Officer (TCO) at Southern State Correctional Facility in Springfield. In early 2009, plaintiff began formal training at the Vermont Corrections Academy in Rutland, completed his training in late February, and thereafter returned to Southern State to continue on-the-job training.

¶ 3. TCOs are at-will, nonunion employees utilized to fill schedule gaps and reduce overtime for regular DOC employees. By statute, TCOs are not entitled to benefits or to work more than 1520 hours per year, 3 V.S.A. § 331, whereas permanent employees are entitled to the benefits and protections due full-time state employees.

¶ 4. Plaintiff received generally positive performance evaluations while at the Academy, although some critical comments also appeared in his evaluations. Trainers at the Academy noted plaintiff's leadership potential, motivation, and willingness to learn. He also received reprimands for unprofessional conduct and being disruptive.

¶ 5. Shortly after plaintiff completed his Academy training, in late February 2009, Southern State supervisors learned that some correctional officers who were members of the Vermont National Guard would be deployed to Afghanistan; they compiled a list of such officers, which included plaintiff. In early March 2009, plaintiff received an email notifying him that he had been selected to be interviewed for three available permanent correctional-officer positions. Plaintiff was one of eight TCOs selected for the interview; two of the other candidates were also National Guard members. All of the candidates submitted a writing sample and resume, and were interviewed. Three panelists — a security and operations supervisor and two shift supervisors — interviewed the eight candidates. The panelists asked all of the candidates the same twelve questions and scored their responses on a scale of 1 (marginal response) to 5 (superior response). At the conclusion of

the interview process, they reported their scores to Southern State's superintendent, who made the final hiring decision.

¶ 6. Neither plaintiff nor the other two National Guard members was selected for promotion. The positions went to three other TCOs — K.H., S.D., and C.S. — none of whom was a current member of the military. K.H. had attained the highest score during the interviews, had more than three years of experience as a correctional officer in New Hampshire, and had participated in specialized training from the U.S. Department of Justice on inmate behavioral management and classification systems. S.D. received the second highest interview score, had military experience, and demonstrated experience as a team leader in a previous position. C.S. scored fifth in the interview, had six months more corrections experience than plaintiff, previously worked for a police department, and held two associates degrees in related fields. Plaintiff received the lowest interview score of all eight applicants, had no corrections experience prior to becoming a TCO, and had no higher education in a related field.

¶ 7. Upon learning that he was not selected for the promotion, plaintiff had a conversation with the supervisor for training and recruitment, Kyle Beckwith. When plaintiff inquired about the promotion process Beckwith responded that "they're not going to give me a full-time benefit slot if I'm leaving in eight months." Later, following an investigation into complaints of employment discrimination, the Southern State superintendent issued a report finding that Beckwith had "overstepped both [his] authority and expertise" in making statements about hiring decisions, that his statements led to "confusing and erroneous information, impressions and implications," and that "classified hires are based first on competence and expertise."

¶ 8. Although not promoted, plaintiff continued to work at Southern State as a TCO. Over the next few months, however, he was the subject of a number of critical reports and evaluations about his job performance. Complaints were received from inmates about his confrontational manner and profanity. On March 24, 2009, plaintiff's supervisors issued him a written warning for being late on two separate occasions. In this warning, plaintiff's supervisors advised him that tardiness was unacceptable and that "continuing . . . failure to meet minimum standards could lead to your termination." In early April 2009, plaintiff was warned about his failure to file disciplinary reports. As a result of these and

other incidents, plaintiff was assigned a field training officer, Travis Rowe, to monitor his performance and provide additional counseling. A few weeks later, Rowe informed supervisor Beckwith that he had observed and spoken with plaintiff about his performance in a number of areas. These included a greater need to be aware of safety issues, to change his "hard and controlling" manner in order to better relate to inmates, to be more cooperative with supervisors, and to show more compassion with inmates.

¶ 9. On May 4, 2009, plaintiff received written notice from a shift supervisor, Michael Arace, about a report that plaintiff had allowed an inmate to leave his cell during a headcount, in violation of Southern State policy and in direct contravention of a specific order by a senior officer. Arace met with plaintiff to discuss the incident and subsequently informed Southern State management about the meeting, explaining that plaintiff "seem[ed] to think that he was not doing anything wrong," that plaintiff did not understand why he was issued feedback, and that plaintiff believed he was "not having any problems." Arace noted that, at one point during the meeting, plaintiff went to the door and said "are we done." The matter was brought to the attention of Southern State's superintendent, who concluded that plaintiff should be discharged. On May 5, 2009, plaintiff received a letter from the superintendent informing him that that he was discharged from employment.

¶ 10. Several months later, plaintiff filed a complaint against the State, alleging that it violated the USERRA by failing to promote him, and by later terminating him, on the basis of his membership in the Vermont National Guard. The State answered and, following discovery, moved for summary judgment. The court held a hearing on the motion in June 2012, and issued a written decision granting the motion in August 2012. This appeal followed.

¶ 11. Plaintiff asserts that summary judgment was improper because genuine issues of material fact exist as to whether his membership in the Vermont National Guard was a motivating factor in the nonpromotion and termination decisions. He also maintains that the State failed to establish that the decisions would have been taken irrespective of plaintiff's military obligations.

¶ 12. We review summary judgment decisions using the same standard as the trial court. Summary judgment orders will be affirmed when there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law. *Campbell v. Stafford*, 2011 VT 11, ¶ 10, 189 Vt. 567, 15 A.3d 126 (mem.). The moving party bears the burden of establishing the absence of a genuine issue of material fact, satisfied in certain cases by showing the nonexistence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); V.R.C.P. 56(c)(1)(B). The nonmoving party is afforded the benefit of all reasonable doubts and inferences. *Campbell*, 2011 VT 11, ¶ 10.

¶ 13. ■ The USERRA provides: "A person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . . or obligation." 38 U.S.C. § 4311(a). Under the statute, "[a]n employer shall be considered to have engaged in actions prohibited . . . under subsection (a), if the person's membership . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership." *Id.* § 4311(c). "USERRA is to be liberally construed in favor of those who served their country." *McGuire v. United Parcel Serv.*, 152 F.3d 673, 676 (7th Cir. 1998).

¶ 14. ■ Under the USERRA, an employee alleging discrimination has "the initial burden of showing by a preponderance of the evidence that the employee's military service was a substantial or motivating factor in the adverse employment action." *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001 (quotation omitted)); see also *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1011 (8th Cir. 2011). Military service is a motivating factor in an adverse employment action when an employer relies on, takes into account, considers, or conditions its decision on an employee's service. *Woodard v. New York Health & Hosps. Corp.*, 554 F. Supp. 2d 329, 348 (E.D.N.Y. 2008). Elements relevant to the determination that military service constitutes a motivating factor include "proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment" of military employees as compared to others

with comparable employment records or offenses. *Sheehan*, 240 F.3d at 1014. Direct or circumstantial evidence may establish discriminatory motive. *Id.*

¶ 15. ■ Plaintiff contends his military obligations were a motivating factor in Southern State's decision not to promote him, pointing out that none of the three promoted individuals was in the military or designated for deployment. To establish a USERRA claim under a failure-to-promote theory, an employee must show that he or she possesses qualifications similar or superior to the successful applicant. *Becker v. Dep't of Veterans Affairs*, 414 F. App'x 274, 277 (Fed. Cir. 2011); cf. *Chenette v. Kenneth Cole Prods., Inc.*, 345 F. App'x 615, 619 (2d Cir. 2009) (rejecting failure-to-promote claim under analogous Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, because plaintiff presented "merely subjective assessment of her own qualifications for promotion [which] cannot defeat evidence that other individuals were more qualified" (quotation omitted)). The service member alleging military animus is required to "show evidence of discrimination other than the fact of nonselection and membership in the protected class." *Sheehan*, 240 F.3d at 1015.

¶ 16. ■ Apart from the fact of his nonselection and service membership, plaintiff adduced no evidence to show that his nonpromotion was motivated by his membership in the Vermont National Guard or his possible deployment. He did not show that his qualifications were similar, equal, or superior to those of the individuals selected for regular positions at Southern State. On the contrary, the evidence showed that plaintiff received the lowest interview score of all interviewees, that he had no corrections experience prior to his temporary position, and that he completed neither supplemental training nor higher education in a related field. His competitors were comparatively better qualified. One achieved the highest interview score, had more than three years of corrections experience, and received specialized training in his field; another attained the second highest interview score, had military experience, and demonstrated leadership capability; while yet another scored fifth in the interview, had more experience than plaintiff, previously worked for a police department, and held two associates degrees in related fields. The fact that these three individuals were not subject to military deployment, by itself, cannot sustain plaintiff's failure-to-promote claim. See *Sheehan*,

240 F.3d at 1014; *Young v. Dep't of Army*, 115 F. App'x 63, 64 (Fed. Cir. 2004). Similarly, plaintiff's observation that one of the successful applicants scored fifth in the interview and that a different National Guard member scored fourth but was not selected does not create a genuine issue of material fact as to discriminatory motive in the selection process — particularly not as to plaintiff.

¶ 17. Plaintiff also relies on supervisor Beckwith's statement to support the claim that plaintiff's membership in the Guard was a motivating factor in his nonpromotion. He cites, in addition, an alleged statement by another supervisor, Stanley Woods, to one of the other National Guard members who did not receive a promotion to full-time employment, to the effect that it was "common knowledge" that "[t]he reason you are not getting promoted is because you are getting deployed." It is undisputed, however, that neither Beckwith nor Woods was among the panelists who conducted the interviews and rated the applicants, and there is no evidence that they took any part in the final selection, which was the superintendent's responsibility. Nor did plaintiff present evidence that the superintendent harbored any animus toward military service, or that plaintiff's military obligation played any part in the superintendent's decision. Plaintiff thus advances, in effect, a "cat's paw" theory of discrimination in violation of the USERRA whereby "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Staub v. Proctor Hosp.*, 562 U.S. 411, ___, 131 S. Ct. 1186, 1194 (2011).[1] The claim is unavailing, as there was no evidence to raise a genuine factual dispute that either Beckwith or Woods performed an act motivated by antimilitary animus that was intended to deny plaintiff the promotion, and that it was, in fact, a proximate cause of the nonpromotion.

¶ 18. Plaintiff also cites two remarks by officer Mark Potanas, the supervisor in charge of scheduling and one of the three members of the interview panel. The first was a comment or question to officer Beckwith, the recruiting officer, to the effect

---

[1] As the high court in *Staub* explained, the term "cats paw" derives from an Aesop's fable in which a monkey induces a cat by flattery to extract roasting chestnuts from a fire. 562 U.S. at ___ n.1, 131 S. Ct. at 1190 n.1.

that "You're bringing me more military?" Potanas explained that the remark was meant as a joke about the scheduling problems sometimes presented by guards who were in the military; he denied that it reflected hostility toward military members and asserted that, in fact, military membership was generally looked upon favorably in hiring by the Department. The second was an alleged remark Potanas made about the participation of military-affiliated guards in the Memorial Day parade, which he supposedly derided as "stupid." Potanas denied using that word, but acknowledged that he "was probably slightly annoyed" by the guards' absence in response to a last-minute request to participate in a nonmilitary exercise.

¶ 19. Plaintiff's argument to the contrary notwithstanding, there is no basis to conclude that these stray remarks had any connection to the employment decisions at issue, and their marginal relevance to the officer's overall attitude toward the military falls well short of raising a genuine dispute that plaintiff's military affiliation was a motivating factor in the decisions. See *Rademacher v. HBE Corp.*, 645 F.3d at 1011 (ruling that employer's expressed frustration at employee enlisting "without more, is insufficient to support an inference that [the employee's] membership in the Air Force Reserves was a motivating factor in [the employer's] decision to discharge him"); *Lamay v. State*, 2012 VT 49, ¶ 10, 191 Vt. 635, 49 A.3d 559 (mem.) (observing that " 'stray' remarks in the workplace can suggest a stereotyped attitude or hostile environment but do not necessarily demonstrate an illegitimate motive sufficient to require the employer to prove that its decision was based on legitimate criteria").

¶ 20. ██ ██ Plaintiff also asserts that his several positive and/or satisfactory performance evaluations raise a genuine dispute as to whether his military affiliation was a motivating factor in the decision to terminate his employment. Plaintiff relies primarily on the timeline of his performance evaluations, asserting that "his communication and ability to accept feedback was good before the deployment was announced, and . . . was bad afterwards." The record does not, however, reflect that plaintiff's training record was uniformly positive before his deployment; he was cited on more than one occasion for being unprofessional and disruptive, and even his positive evaluations contained comments and incidents foreshadowing later, more serious criticisms of his judgment, including the need to "channel his enthusiasm and experi-

ence into a positive course of action," a verbal confrontation with an inmate, and the need "to work on humanity and rapport building." Many of the later, more negative incidents and evaluations occurred under circumstances where plaintiff was compelled to work more independently while on the job, rather than in training at the Academy, and were in response to inmate complaints, rather than complaints by supervisors. There were also reports that he was perennially tardy. Thus, the record does not support an inference or raise a genuine dispute that plaintiff's negative evaluations were unwarranted, pretextual, or invidiously motivated. See *Billet v. CIGNA Corp.*, 940 F.2d 812, 826 (3d Cir. 1991) ("We have stated that prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual."), *overruled on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010) ("Even if credited, plaintiff's claim of prior favorable performance [evaluations] does not, without more, prove his subsequent poor reviews were unwarranted."); *Iverson v. Verizon Commc'ns*, 2009 WL 3334796, at \*5 (S.D.N.Y. 2009) ("Demonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext." (quotation omitted)).

¶ 21. ▮ Plaintiff lastly cites the testimony of a DOC administrative assistant that she was informed by the Agency of Human Services that TCOs who were deployed were required to resign and then reapply when they returned. The same individual also explained that DOC had little experience initially in dealing with large-scale deployments in 2009, and that she was later informed that such employees would be entitled to their positions when they returned. She also understood that permanent employees who were deployed were not compelled to go through the process of resigning and reapplying. Whatever this evidence might say about the DOC's differential treatment of temporary and classified employees, it falls well short of creating a genuine issue of material fact that plaintiff's military affiliation or deployment was a motivating factor in Southern State's promotion or termination decisions.[2]

---

[2] This apparent policy concerning TCOs never actually applied to plaintiff because he was terminated before deployment. Nor is it self-evidently inconsistent with the USERRA, under which service-member employees must notify their employer of

¶ 22. ■ The dissent's contention that summary judgment was premature in this case is unpersuasive. The dissent posits as evidence of improper motivation plaintiff's testimony that supervisor Beckwith told him that promotion to fulltime status was "automatic," and that plaintiff's expectations were allegedly "dashed" upon learning otherwise. *Post*, ¶¶ 30, 35. Absent correlating evidence that Beckwith reflected the policy of Southern State, the probative value of the testimony is not evident. Moreover, this particular argument does not appear to have been raised below, was not addressed by the trial court in its written ruling, and is absent from plaintiff's brief on appeal. Accordingly, we do not find that it supports a contrary holding.

¶ 23. ■ The dissent would also find the statements by supervisors Beckwith and Potanas, coupled with the fact that none of the soon-to-be-deployed applicants was promoted, to be sufficient to raise a genuine factual dispute as to discriminatory motive. As explained earlier, however, there is no evidence that the officers played any role in the employment decisions at issue. The mere fact of nonpromotion does not support an inference of discrimination.

¶ 24. ■ ■ Finally, the dissent takes issue with the reliance — both by the trial court and by this Court — on evidence that plaintiff was not as qualified for the position as those that were hired. The dissent is concerned that this improperly "collapses" the two-step analytic framework under the USERRA — evaluating motive and then, if necessary, examining the employer's affirmative defense — into a "single" step. *Post*, ¶ 39. As noted, however, a wide "variety of factors" is relevant to the threshold issue of whether the employer acted with discriminatory motivation, including its "disparate treatment of certain employees compared to other employees" with similar records. *Sheehan*, 240 F.3d at 1014. "In determining whether the employee has proven that his protected status was part of the motivation for the agency's conduct, all record evidence may be considered, including

their intent to return to employment or reapply for employment. 38 U.S.C. § 4312(a) (stating that "any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if . . . the person reports to, or submits an application for reemployment to, such employer in accordance with the provisions of subsection (e)"); *id.* § 4312(e) (listing circumstances and corresponding timeframes for reporting or employment reapplication process).

the agency's explanation for the actions taken." *Id.* Thus, plaintiff's low rating by the interview panel, which posed the same questions to each of the applicants for promotion, supports the finding that plaintiff's membership in the Guard was not a motivating factor in the employment decision. See *Becker v. Dep't of Veterans Affairs,* 373 F. App'x 54, 57 (Fed. Cir. 2010) (relying on declarations by interview panel which posed identical questions to all applicants and gave plaintiff low score in finding that plaintiff's military service was not a motivating factor in nonpromotion).

¶ 25. Accordingly, we discern no basis to disturb the judgment.

*Affirmed.*

¶ 26. **Robinson, J.,** dissenting. If I were a factfinder faced with the evidence presented by the parties in connection with this summary judgment motion, I might well find for defendants. But that is not our role on summary judgment. See *Booska v. Hubbard Ins. Agency, Inc.,* 160 Vt. 305, 309, 627 A.2d 333, 335 (1993) ("Summary judgment is not a substitute for a determination on the merits, so long as evidence has been presented which creates an issue of material fact, no matter what view the court may take of the relative weight of that evidence." (quotation omitted)). In determining whether, on the basis of the record before us, a party is entitled to summary judgment, we must "afford the nonmoving party 'the benefit of all reasonable doubts and inferences.'" *Glassford v. BrickKicker,* 2011 VT 118, ¶ 12, 191 Vt. 1, 35 A.3d 1044 (quoting *Doe v. Forrest,* 2004 VT 37, ¶ 9, 176 Vt. 476, 853 A.2d 48); see also *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [the judge] is ruling on a motion for summary judgment or for a directed verdict.").

¶ 27. As the majority notes, an employee alleging discrimination under the USERRA has the initial burden of showing that the employee's military service was a "substantial or motivating factor" in the adverse employment action. *Sheehan v. Dep't of Navy,* 240 F.3d 1009, 1013 (Fed. Cir. 2001). Once a plaintiff employee makes such a showing, the burden shifts *to the employer* to show that the employer would have taken the adverse action anyway, for valid reasons. *Id.*

¶ 28. The summary judgment analysis in a case like this, in which the critical disputed fact is the employer's motives for fail-

ing to promote, and then for subsequently terminating plaintiff, is particularly challenging. On the one hand, a plaintiff must have *some* evidence of discrimination other than an adverse action and membership in the protected class in order to establish a legally sufficient case. *Sheehan*, 240 F.3d at 1014. On the other hand, "[c]ircumstantial evidence will often be a factor in these cases, for discrimination is seldom open or notorious." *Id.* at 1013; see also *Wheeler v. Marathon Printing, Inc.*, 974 P.2d 207, 214 (Or. Ct. App. 1998) ("[P]roof of motivation is rarely direct and often, necessarily, circumstantial and inferential."). As the majority notes, discriminatory motive under the USERRA may reasonably be inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees. *Ante*, ¶ 14. As we recently recognized in an analogous context in which plaintiff's state of knowledge was in dispute, "[t]he ultimate assessment of the inferences [to be drawn from the facts] is for the jury rather than the court, unless reasonable minds could not differ on the question of knowledge." *Clarke v. Abate*, 2013 VT 52, ¶ 21, 194 Vt. 294, 80 A.3d 578.

¶ 29. Given the record before us, I conclude that reasonable minds could well differ on the question of whether plaintiff's anticipated deployment was a substantial factor in Southern State's decisions to: (1) not promote plaintiff and (2) subsequently terminate plaintiff's employment.

I.

¶ 30. Considering the evidence in the light most favorable to plaintiff, the record reflects the following with respect to SSCF's decision not to hire plaintiff as a classified corrections officer. Before plaintiff was hired as a temporary corrections officer (TCO), and again during his training at the academy in December 2008 and January 2009, the Training Recruitment Coordinator for SSCF, Kyle Beckwith, told him more than once that TCOs are hired for full-time permanent positions with union membership and other benefits after three-to-six months as TCOs. Beckwith told him that this promotion was automatic, and did not require application and interviews in front of an interviewing board. Another TCO hired at the same time as plaintiff corroborated plaintiff's testimony on this point.

¶ 31. In late February and early March of 2009 — within the time frame plaintiff had been led to believe he could expect to be hired as a permanent corrections officer — managers at SSCF identified plaintiff as one of nine correctional officers and TCOs likely to be deployed to Afghanistan in September or October of that year. Managers expressed concern about the impact of the impending deployments on SSCF correctional officer staffing, and a commitment to being "proactive" concerning staffing as it related to upcoming deployments, in emails that included senior SSCF leadership, including the Superintendent and Assistant Superintendent of SSCF.

¶ 32. Within two weeks of the emails identifying him as subject to deployment in the fall, and expressing concern about the impact of correctional officer deployments on Southern State staffing, Southern State interviewed plaintiff for one of the three open interim correctional officer positions — classified positions for which plaintiff had been led to believe he would be hired as a matter of course. The application and interview process was a departure from what plaintiff had been led to expect in connection with his anticipated promotion to a classified position. Two other applicants for the position, out of a total of eight, were also subject to deployment in the fall. Neither plaintiff, nor the other two soon-to-be-deployed applicants, got the job.

¶ 33. After he was passed over, plaintiff discussed his situation with Beckwith, the recruitment and training coordinator. Beckwith said to him, "they're not going to give [you] a full-time benefit slot if [you're] leaving in eight months." Beckwith was not just a random co-worker; he was the officer in charge of recruiting and training correctional officers at Southern State. Other officers relied on him to explain Southern State's personnel policies to new hires. Moreover, the Security and Operations Officer responsible for scheduling corrections officers, Mark Potanas, who participated on the committee that evaluated and rated applicants for the CO positions, acknowledged expressing his exasperation to Beckwith — the recruitment officer — for "bringing [Patanos] more military."

¶ 34. In addition to the above, plaintiff also presented evidence that human resource personnel at Southern State did not at the time understand their obligations under the USERRA — a factor that lends further support to plaintiff's theory that in focusing on its staffing concerns, management, insensitive to its legal obligations under federal law, concluded that hiring plaintiff to a full-time, permanent position within months of his anticipated deployment would not make any sense.

¶ 35. The above evidence, if believed by the jury, is sufficient to support an inference that Southern State denied plaintiff the CO position due, in substantial part, to his anticipated deployment, thus satisfying plaintiff's initial burden. As evidence in support of his theory that Southern State did not hire him for the CO position due in part to his anticipated deployment, plaintiff can point to his dashed expectation of full-time, permanent employment as a corrections officer following Southern State's identification of plaintiff as someone facing deployment; the contemporaneously expressed concerns of Southern State management about the impact of deployments on correctional officer staffing; the fact that *none* of the soon-to-be-deployed applicants were hired to the classified positions; the incriminating statement by the Southern State officer tasked with communicating many of Southern State's personnel policies to new hires; and the expressed exasperation with hires who have military obligations by the Security and Operations Supervisor. See *Sheehan*, 240 F.3d at 1014 (identifying temporal proximity between adverse action and military action — in this case, anticipated deployment; expressed hostility by management toward members protected by the statute — in this case, soon-to-be-deployed National Guard members; and disparate treatment — in this case, of officers facing deployment as compared to those who are not, as factors supporting inference of discriminatory motive).

¶ 36. The majority does not address the allegation that Southern State replaced its presumptive promotion of TCOs to open CO positions with a revamped application and interview process immediately after realizing that several TCOs who would be subject to promotions were going to be deployed in six-to-seven months. This is a significant factor that, if believed, could support an inference that SSCF altered its hiring process to avoid hiring soon-to-be-deployed military personnel for classified positions.

¶ 37. The majority explains away Beckwith's statement that plaintiff would not get a CO position given his anticipated deployment by noting that Beckwith was not on the panel that interviewed applicants for the CO position and made recommendations regarding hiring.[3] The jury ultimately may be persuaded

---

[3] The majority likewise dismisses the significance of a shift supervisor's comment to another soon-to-be-deployed TCO who was passed over like plaintiff: "The

that Beckwith's statement does not reflect SSCF policy, that Beckwith himself had no role in the challenged hiring decision, and that the statement is entitled to minimal or even no weight. But the jury could well conclude that this statement by an officer intimately involved with recruiting and training new officers, and with explaining to them Southern State's policies, reflected Southern State's institutional attitude. It should be left to a jury to determine whether Beckwith actually made the statement, whether the statement was an accurate reflection of management attitudes at Southern State, and how much weight to give the testimony.

¶ 38. The majority likewise dismisses Mark Potanas's expressions of frustration with the recruitment of TCOs who have military obligations as "stray remarks," even though Potanas was on the hiring panel for the CO positions denied plaintiff. In so framing the evidence, I believe the majority has weighed evidence itself, and has drawn inferences adverse to the plaintiff, in contravention of our summary judgment standard.

¶ 39. The most significant factor identified by the majority in support of its affirmance is its view that plaintiff failed to show that he was as qualified for the positions as those that were hired. In so holding, I believe the majority collapses the two-step analytical framework applicable under the USERRA into a single step. That is, the majority essentially concludes that the reason plaintiff has failed to make a facial claim is that Southern State would not have hired plaintiff anyway because he was less qualified than the officers who were hired. Because plaintiff mustered sufficient evidence to support the inference that he was passed over on the basis of impermissible discriminatory motives, the question of whether Southern State would have declined to hire him in any event goes to SSCF's affirmative defense — a claim with respect to which Southern State, and not plaintiff, bears the burden.

¶ 40. The majority cites substantial evidence from which a jury could conclude that plaintiff was not among the most qualified candidates for the CO position and would not have gotten the job even if he had not been facing deployment. To a large extent the majority relies on the scores assigned through the hiring process

---

reason you are not getting promoted is because you are getting deployed. It's common knowledge."

to the respective candidates, implicitly accepting the scores as an undisputed matter of fact entitled to weight. To the extent that plaintiff's theory is that the process was stacked against him because of his anticipated deployment, the credibility of the interview ratings is itself very much in issue. The facts that the three who were hired were not facing anticipated deployment, and that the three who were facing deployments were not hired, could support plaintiff's inference that the deck was stacked. By the same token, the fact that the three TCOs scheduled for deployment in the fall received the three lowest subjective ratings in the interview process likewise supports plaintiff's theory of the case, rather than Southern State's claim that the three to-be-deployed TCOs were the least qualified. Moreover, plaintiff has mustered evidence of his own that undermines the suggestion that Southern State's evidence establishes its affirmative defense as a matter of law. As noted above, plaintiff presented evidence of positive reviews and scores during his training and positive performance reviews. Given the above evidence, I cannot conclude that, as a matter of law, the only legally permissible inference is that Southern State's hiring decision was nonpretextual and unaffected by plaintiff's imminent deployment.

## II.

¶ 41. Plaintiff's second claim is that after he was passed over, Southern State management began making his life more difficult and disciplining him for things for which others were not disciplined, and ultimately terminated him following an incident that did not warrant termination. First, he presented evidence that he was scheduled for strenuous "3-2-1" schedules, which entail working a third shift (10:00 p.m. to 6:00 a.m.) followed immediately by a second shift (2:00 p.m. to 10:00 p.m.) followed by a first shift (6:00 a.m. to 2:00 p.m.). Given his significant commute, this was a particularly challenging schedule. Second, he presented evidence that he was disciplined for being late on two occasions, when other officers are not always written up for similar tardiness. Third, and most significant, he presented evidence that he was disciplined for allowing an inmate to go through a door to get to class at the request of a case worker during a head count; plaintiff testified that his on-the-job trainer had told him this was appropriate and had done the same thing while training plaintiff. This incident triggered his termination. It also occurred at about the

same time as a few more CO positions were opening up, for which TCOs such as plaintiff would be eligible to apply.

¶ 42. Again, a jury could well consider all of this evidence and conclude that plaintiff's termination was not related to his anticipated deployment and was not pretextual. But in light of the evidence cited above, which is sufficient to make out a legal claim on its face, plaintiff is entitled to a determination by a jury, not the court. *Clarke*, 2013 VT 52, ¶ 21.

¶ 43. For the foregoing reasons, I respectfully dissent.