2013 VT 112




Brown v. State (2012-337)


 


2013 VT 112


 


[Filed 13-Dec-2013]


 


NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.


 


 



 
 2013 VT 112

 

  



 
 No. 2012-337

 

  



 
 Daniel Brown

 

 
 
 Supreme Court

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 On Appeal from

 

 
 
      v.

 

 
 
 Superior Court, Rutland Unit,

 

 
 
  

 

 
 
 Civil Division

 

 
 
  

 

 
 
  

 

 
 
 State of Vermont

 

 
 
 March Term, 2013

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 Mary
 Miles Teachout, J.

 

 
 
  

 

 James G. Levins of Tepper Dardeck Levins & Gatos, LLP,
Rutland, for Plaintiff-Appellant.


 


William H. Sorrell, Attorney General, and Jonathan T. Rose
and David R. Groff, 


  Assistant Attorneys General, Montpelier, for
Defendant-Appellee.


 


 


PRESENT:  Dooley, Skoglund, Burgess and Robinson, JJ.,
and Carroll, Supr. J.,


                    
Specially Assigned


 


 


¶ 1.          
BURGESS, J.   Plaintiff Daniel Brown appeals from a
superior court decision granting summary judgment in favor of the State on
plaintiff’s claim of employment discrimination in violation of the Uniformed
Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C.
§ 4311.  He contends that summary judgment was improper because
genuine material issues of fact remained as to whether his membership in the
Vermont National Guard was a motivating factor in the State’s decisions not to
promote him, and ultimately to terminate him from his position.  We
affirm.


¶ 2.          
The facts may be summarized as follows.  In December 2008, the
Vermont Department of Corrections (DOC) hired plaintiff as a Temporary
Corrections Officer (TCO) at Southern State Correctional Facility in
Springfield.  In early 2009, plaintiff  began formal training at the
Vermont Corrections Academy in Rutland, completed his training in late
February, and thereafter returned to Southern State to continue on-the-job
training.   


¶ 3.          
TCOs are at-will, nonunion employees utilized to fill schedule gaps and
reduce overtime for regular DOC employees.  By statute, TCOs are not
entitled to benefits or to work more than 1520 hours per year, 3 V.S.A.
§ 331, whereas permanent employees are entitled to the benefits and
protections due full-time state employees. 
      


¶ 4.          
Plaintiff received generally positive performance evaluations while at
the Academy, although some critical comments also appeared in his
evaluations.  Trainers at the Academy noted plaintiff’s leadership
potential, motivation, and willingness to learn.  He also received
reprimands for unprofessional conduct and being disruptive.      


¶ 5.          
Shortly after plaintiff completed his Academy training, in late February
2009, Southern State supervisors learned that some correctional officers who
were members of the Vermont National Guard would be deployed to Afghanistan;
they compiled a list of such officers, which included plaintiff.  In early
March 2009, plaintiff received an email notifying him that he had been selected
to be interviewed for three available permanent correctional-officer positions. 
Plaintiff was one of eight TCO’s selected for the interview; two of the other
candidates were also National Guard members.  All of the candidates
submitted a writing sample and resume, and were interviewed.  Three
panelists—a security and operations supervisor and two shift
supervisors—interviewed the eight candidates.  The panelists asked
all of the candidates the same twelve questions and scored their responses on a
scale of 1 (marginal response) to 5 (superior response).  At the
conclusion of the interview process, they reported their scores to Southern
State’s superintendent, who made the final hiring decision.      


¶ 6.          
Neither plaintiff nor the other two National Guard members was selected
for  promotion.  The positions went to three other TCOs—K.H., S.D.,
and C.S.—none of whom was a current member of the military.  K.H. had
attained the highest score during the interviews, had more than three years of
experience as a correctional officer in New Hampshire, and had participated in
specialized training from the U. S. Department of Justice on inmate behavioral
management and classification systems.  S.D. received the second highest
interview score, had military experience, and demonstrated experience as a team
leader in a previous position.  C.S. scored fifth in the interview, had
six months more corrections experience than plaintiff, previously worked for a
police department, and held two associates degrees in related fields. 
Plaintiff received the lowest interview score of all eight applicants, had no
corrections experience prior to becoming a TCO, and had no higher education in
a related field.    


¶ 7.          
Upon learning that he was not selected for the promotion, plaintiff had
a conversation with the supervisor for training and recruitment, Kyle Beckwith.
 When plaintiff inquired about the promotion process Beckwith responded
that “they’re not going to give me a full-time benefit slot if I’m leaving in
eight months.”  Later, following an investigation into complaints of
employment discrimination, the Southern State superintendent issued a report
finding that Beckwith had “overstepped both [his] authority and expertise” in
making statements about hiring decisions, that his statements led to “confusing
and erroneous information, impressions and implications,” and that “classified
hires are based first on competence and expertise.”   


¶ 8.          
Although not promoted, plaintiff continued to work at Southern State as
a TCO.  Over the next few months, however, he was the subject of a number
of critical reports and evaluations about his job performance.  Complaints
were received from inmates about his confrontational manner and
profanity.  On March 24, 2009, plaintiff’s supervisors issued him a
written warning for being late on two separate occasions.  In this
warning, plaintiff’s supervisors advised him that tardiness was unacceptable
and that “continuing . . . failure to meet minimum standards could lead to your
termination.”  In early April 2009, plaintiff was warned about his failure
to file disciplinary reports.  As a result of these and other incidents,
plaintiff was assigned a field training officer, Travis Rowe, to monitor his
performance and provide additional counseling.  A few weeks later, Rowe
informed supervisor Beckwith that he had observed and spoken with plaintiff
about his performance in a number of areas.  These included a greater need
to be aware of safety issues, to change his “hard and controlling” manner in
order to better relate to inmates, to be more cooperative with supervisors, and
to show more compassion with inmates.    


¶ 9.          
On May 4, 2009, plaintiff received written notice from a shift
supervisor, Michael Arace, about a report that plaintiff had allowed an inmate
to leave his cell during a headcount, in violation of Southern State policy and
in direct contravention of a specific order by a senior officer.  Arace
met with plaintiff to discuss the incident and subsequently informed Southern
State management about the meeting, explaining that plaintiff “seem[ed] to
think that he was not doing anything wrong,” that plaintiff did not understand
why he was issued feedback, and that plaintiff believed he was “not having any
problems.”  Arace noted that, at one point during the meeting, plaintiff
went to the door and said “are we done.”   The matter was brought to
the attention of Southern State’s superintendent, who concluded that plaintiff
should be discharged.  On May 5, 2009, plaintiff received a letter from
the superintendent informing him that that he was discharged from
employment.     


¶ 10.      
Several months later, plaintiff filed a complaint against the State,
alleging that it violated the USERRA by failing to promote him, and by later
terminating him, on the basis of his membership in the Vermont National
Guard.  The State answered and, following discovery, moved for summary
judgment.  The court held a hearing on the motion in June 2012, and issued
a written decision granting the motion in August 2012.  This appeal
followed.   


¶ 11.      
Plaintiff asserts that summary judgment was improper because genuine
issues of material fact exist as to whether his membership in the Vermont
National Guard was a motivating factor in the non-promotion and termination
decisions.   He also maintains that the State failed to establish
that the decisions would have been taken irrespective of plaintiff’s military
obligations.     


¶ 12.      
We review summary judgment decisions using the same standard as the trial
court.  Summary judgment orders will be affirmed when there is no genuine
issue as to any material fact and the moving party is entitled to judgment as a
matter of law.  Campbell v. Stafford, 2011 VT 11, ¶ 10, 189
Vt. 567, 15 A.3d 126 (mem.).  The moving party bears the burden of
establishing the absence of a genuine issue of material fact, satisfied in
certain cases by showing the nonexistence of evidence to support the non-moving
party’s case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-25
(1986); V.R.C.P. 56(c)(1)(B).  The non-moving party is afforded the
benefit of all reasonable doubts and inferences.  Campbell, 2011 VT
11, ¶ 10. 


¶ 13.      
The USERRA provides: “A person who is a member
of . . . or has an obligation to perform service in a uniformed
service shall not be denied initial employment, reemployment, retention in
employment, promotion, or any benefit of employment by an employer on the basis
of that membership . . .  or obligation.”  38 U.S.C.
§ 4311(a).  Under the statute, “[a]n employer shall be
considered to have engaged in actions
prohibited . . . under subsection (a), if the person’s
membership . . . is a motivating factor in the
employer’s action, unless the employer can prove that the action would have
been taken in the absence of such membership.”  Id. § 4311(c).
 “USERRA is to be liberally construed in favor
of those who served their country.”  McGuire v. United Parcel Serv.,
152 F.3d 673, 676 (7th Cir. 1998).  


¶ 14.       Under
the USERRA, an employee alleging discrimination has “the initial burden of
showing by a preponderance of the evidence that the employee’s military service
was a substantial or motivating factor in the adverse employment action.”
 Sheehan v. Dep’t of Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001
(quotation omitted)); see also Rademacher v. HBE Corp., 645 F.3d 1005,
1011 (8th Cir. 2011).  Military service is a motivating factor in an
adverse employment action when an employer relies on, takes into account,
considers, or conditions its decision on an employee’s service.  Woodward
v. New York Health & Hosps. Corp., 554 F. Supp. 2d 329, 348 (E.D.N.Y.
2008).  Elements relevant to the determination that military service
constitutes a motivating factor include “proximity in time between the
employee’s military activity and the adverse employment action, inconsistencies
between the proffered reason and other actions of the employer, an employer’s
expressed hostility towards members protected by the statute together with
knowledge of the employee’s military activity, and disparate treatment” of
military employees as compared to others with comparable employment records or
offenses.  Sheehan, 240 F.3d at 1014.  Direct or
circumstantial evidence may establish discriminatory motive.  Id. 


¶ 15.      
Plaintiff contends his military obligations were a motivating factor in
Southern State’s decision not to promote him, pointing out that none of the
three promoted individuals was in the military or designated for
deployment.  To establish a USERRA claim under a failure-to-promote
theory, an employee must show that he or she possesses qualifications similar
or superior to the successful applicant. Becker v. Dep’t of Veterans Affairs,
414 F. App’x 274, 277 (Fed Cir. 2011); cf. Chenette v. Kenneth Cole Prods.,
Inc., 345 F. App’x 615, 619 (2d Cir. 2009) (rejecting failure-to-promote
claim under analogous Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000, because plaintiff presented “ merely subjective assessment of
her own qualifications for promotion [which] cannot defeat evidence that other
individuals were more qualified” (quotation omitted)).  The service member
alleging military animus is required to “show evidence of discrimination other
than the fact of non-selection and membership in the protected class.”  Sheehan,
240 F.3d at 1015.    


¶ 16.      
Apart from the fact of his non-selection and service membership,
plaintiff adduced no evidence to show that his non-promotion was motivated by
his membership in the Vermont National Guard or his possible deployment.
 He did not show that his qualifications were similar, equal, or superior
to those of the individuals selected for regular positions at Southern
State.  On the contrary, the evidence showed that plaintiff received the
lowest interview score of all interviewees, that he had no corrections
experience prior to his temporary position, and that he completed neither
supplemental training nor higher education in a related field.  His
competitors were comparatively better qualified.  One achieved the highest
interview score, had more than three years of corrections experience, and
received specialized training in his field; another attained the second highest
interview score, had military experience, and demonstrated leadership
capability; while yet another scored fifth in the interview, had more
experience than plaintiff, previously worked for a police department, and held
two associates degrees in related fields.  The fact that these three
individuals were not subject to military deployment, by itself, cannot sustain
plaintiff’s failure-to-promote claim.  See Sheehan, 240 F.3d at
1014; Young v. Dep’t of Army, 115 F. App’x 63, 64 (Fed. Cir.
2004).  Similarly, plaintiff’s observation that one of the successful
applicants scored fifth in the interview and that a different National Guard
member scored fourth but was not selected does not create a genuine issue of
material fact as to discriminatory motive in the selection process—particularly
not as to plaintiff.


¶ 17.      
Plaintiff also relies on supervisor Beckwith’s statement to support the
claim that plaintiff’s membership in the Guard was a motivating factor in his
non-promotion.  He cites, in addition, an alleged statement by another
supervisor, Stanley Woods, to one of the other National Guard members who did
not receive a promotion to full-time employment, to the effect that it was
“common knowledge” that “[t]he reason you are not getting promoted is because
you are getting deployed.”  It is undisputed, however, that neither
Beckwith nor Woods was among the panelists who conducted the interviews and
rated the applicants, and there is no evidence that they took any part in the
final selection, which was the superintendent’s responsibility.  Nor did
plaintiff present evidence that the superintendent harbored any animus toward
military service, or that plaintiff’s military obligation played any part in
the superintendent’s decision.  Plaintiff thus advances, in effect, a
“cat’s paw” theory of discrimination in violation of the USERRA whereby “if a
supervisor performs an act motivated by antimilitary animus that is intended by
the supervisor to cause an adverse employment action, and if that act is a
proximate cause of the ultimate employment action, then the employer is liable
under USERRA.”  Staub v. Proctor Hosp., ___ U.S. ___, 131 S. Ct.
1186, 1194 (2011).[1] 
The claim is unavailing, as there was no evidence to raise a genuine factual
dispute that either Beckwith or Woods performed an act motivated by
antimilitary animus that was intended to deny plaintiff the promotion, and that
it was, in fact, a proximate cause of the non-promotion.


¶ 18.      
Plaintiff also cites two remarks by officer
Mark Potanas, the supervisor in charge of scheduling and one of the three
members of the interview panel.  The first was a comment or question to
officer Beckwith, the recruiting officer, to the effect that “You’re bringing
me more military?”  Potanas explained that the remark was meant as a joke
about the scheduling problems sometimes presented by guards who were in the
military; he denied that it reflected hostility toward military members and
asserted that, in fact, military membership was generally looked upon favorably
in hiring by the Department.   The second was an alleged remark
Potanas made about the participation of military-affiliated guards in the
Memorial Day parade, which he supposedly derided as “stupid.”  Potanas
denied using that word, but acknowledged that he “was probably slightly
annoyed” by the guards’ absence in response to a last-minute request to
participate in a non-military exercise. 


¶ 19.      
Plaintiff’s argument to the contrary
notwithstanding, there is no basis to conclude that these stray remarks had any
connection to the employment decisions at issue, and their marginal relevance
to the officer’s overall attitude toward the military falls well short of
raising a genuine dispute that plaintiff’s military affiliation was a
motivating factoring in the decisions.  See Rademacher v. HBE Corp.,
645 F.3d at 1011 (ruling that employer’s expressed frustration at employee
enlisting “without more, is insufficient to support an inference that [the
employee’s] membership in the Air Force Reserves was a motivating factor in
[the employer’s] decision to discharge him”); Lamay v. State, 2012 VT
49, ¶ 10, 191 Vt. 635, 49 A.3d 559 (mem.) (observing that “ ‘stray’ remarks in
the workplace can suggest a stereotyped attitude or hostile environment but do
not necessarily demonstrate an illegitimate motive sufficient to require the
employer to prove that its decision was based on legitimate criteria”). 



¶ 20.      
Plaintiff also asserts that his several positive and/or satisfactory
performance evaluations raise a genuine dispute as to whether his military
affiliation was a motivating factor in the decision to terminate his
employment.  Plaintiff relies primarily on the timeline of his performance
evaluations, asserting that “his communication and ability to accept feedback
was good before the deployment was announced, and . . . was bad afterwards.”   The
record does not, however, reflect that plaintiff’s training record was
uniformly positive before his deployment; he was cited on more than one
occasion for being unprofessional and disruptive, and even his positive
evaluations contained comments and incidents foreshadowing later, more serious
criticisms of his judgment, including the need to “channel his enthusiasm and
experience into a positive course of action,” a verbal confrontation with an
inmate, and the need “to work on humanity and rapport building.”  Many of
the later, more negative incidents and evaluations occurred under circumstances
where plaintiff was compelled to work more independently while on the job,
rather than in training at the Academy, and were in response to inmate complaints,
rather than complaints by supervisors.  There were also reports that he
was perennially tardy.  Thus, the record does not support an inference or
raise a genuine dispute that plaintiff’s negative evaluations were unwarranted,
pretextual, or invidiously motivated.  See Billet v. CIGNA Corp.,
940 F.2d 812, 826 (3d Cir. 1991) (“We have stated that prior good evaluations
alone cannot establish that later unsatisfactory evaluations are pretextual.”),
overruled on other grounds by St. Mary’s Honor Ctr. v. Hicks, 509
U.S. 502 (1993); Mattera v. JP Morgan Chase Corp., 740 F. Supp. 2d 561,
577 (S.D.N.Y. 2010) (“Even if credited, plaintiff’s claim of prior favorable
performance [evaluations] does not, without more, prove his subsequent poor
reviews were unwarranted.”); Iverson v. Verizon Commc’ns, 2009 WL
3334796, at *5 (S.D.N.Y. 2009) (“Demonstration of past positive performance is
insufficient to raise a genuine issue of disputed fact with respect to
pretext.” (quotation omitted)). 


¶ 21.      
Plaintiff lastly cites the testimony of a DOC administrative assistant
that she was informed by the Agency of Human Services that TCOs who were
deployed were required to resign and then reapply when they returned.  The
same individual also explained that DOC had little experience initially in
dealing with large-scale deployments in 2009, and that she was later informed
that such employees would be entitled to their positions when they returned.
 She also understood that permanent employees who were deployed were not
compelled to go through the process of resigning and reapplying.  Whatever
this evidence might say about the DOC’s differential treatment of temporary and
classified employees, it falls well short of creating a genuine issue of
material fact that plaintiff’s military affiliation or deployment was a
motivating factor in Southern State’s promotion or termination decisions.[2]  


¶ 22.      
The dissent’s contention that summary judgment was premature in this
case is unpersuasive.  The dissent posits as evidence of improper
motivation plaintiff’s testimony that supervisor Beckwith told him that
promotion to fulltime status was “automatic,” and that plaintiff’s expectations
were allegedly “dashed” upon learning otherwise.  Post ¶¶ 30, 35.
 Absent correlating evidence that Beckwith reflected the policy of
Southern State, the probative value of the testimony is not evident. 
Moreover, this particular argument does not appear to have been raised below,
was not addressed by the trial court in its written ruling, and is absent from
plaintiff’s brief on appeal.  Accordingly, we do not find that it supports
a contrary holding.


¶ 23.      
The dissent would also find the statements by supervisors Beckwith and
Potanas, coupled with the fact that none of the soon-to-deployed applicants was
promoted, to be sufficient to raise a genuine factual dispute as to
discriminatory motive.  As explained earlier, however, there is no
evidence that the officers played any role in the employment decisions at issue. 
The mere fact of non-promotion does not support an inference of
discrimination.  


¶ 24.       Finally, the
dissent takes issue with the reliance—both by the trial court and by this
Court—on evidence that plaintiff was not as qualified for the position as those
that were hired.  The dissent is concerned that this improperly
“collapses” the two-step analytic framework under the USERRA—evaluating motive
and then, if necessary, examining the employers affirmative defense—into a
“single” step.  Post ¶ 39.  As noted, however, a wide “variety
of factors” is relevant to the threshold issue of whether the employer acted
with discriminatory motivation, including its “disparate treatment of certain
employees compared to other employees” with similar records.  Sheehan,
240 F.3d at 1014.  “In determining whether the employee has proven that
his protected status was part of the motivation of the agency’s conduct, all
record evidence may be considered, including the agency’s explanation for the
actions taken.”  Id.  Thus, plaintiff’s low rating by the
interview panel, which posed the same questions to each of the applicants for
promotion, supports the finding that plaintiff’s membership in the Guard was
not a motivating factor in the employment decision.  See Becker v.
Dep’t of Veterans Affairs, 373 F. App’x 54, 59 (Fed. Cir. 2010) (relying on
declarations by interview panel which posed identical questions to all
applicants and gave plaintiff low score in finding that plaintiff’s military
service was not a motivating factor in non-promotion). 


¶ 25.       Accordingly, we
discern no basis to disturb the judgment.  


Affirmed. 



 
  

 

 
 
  

 

 
 
 FOR THE
 COURT:

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 Associate
 Justice

 

  


 


¶ 26.       ROBINSON, J.,
dissenting.   If I were a factfinder faced with the evidence
presented by the parties in connection with this summary judgment motion, I
might well find for defendants.  But that is not our role on summary
judgment.  See Booska v. Hubbard Ins. Agency, Inc., 160 Vt. 305,
309, 627 A.2d 333, 335 (1993) (“Summary judgment is
not a substitute for a determination on the merits, so long as evidence has
been presented which creates an issue of material fact, no matter what view the
court may take of the relative weight of that evidence.” (quotation omitted)).  In determining whether, on the basis of the record
before us, a party is entitled to summary judgment, we must “afford the
nonmoving party ‘the benefit of all reasonable doubts and
inferences.’ ”  Glassford v. BrickKicker, 2011 VT 118, ¶ 12,
191 Vt. 1, 35 A.3d 1044 (quoting Doe v. Forrest, 2004 VT 37, ¶ 9, 176
Vt. 476, 853 A.2d 48); see also Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 255 (1986) (“Credibility determinations,
the weighing of the evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of a judge, whether [the judge] is ruling
on a motion for summary judgment or for a directed verdict.”).  


¶ 27.      
As the majority notes, an employee alleging discrimination under the
USERRA has the initial burden of showing that the employee’s military service
was a “substantial or motivating factor” in the adverse employment
action.  Sheehan v. Dep’t of Navy, 240 F.3d 1009, 1013 (Fed. Cir.
2001).  Once a plaintiff employee makes such a showing, the burden shifts to
the employer to show that the employer would have taken the adverse action
anyway, for valid reasons.  Id.  


¶ 28.      
The summary judgment analysis in a case like this, in which the critical
disputed fact is the employer’s motives for failing to promote, and then for
subsequently terminating plaintiff, is particularly challenging.  On the
one hand, a plaintiff must have some evidence of discrimination other
than an adverse action and membership in the protected class in order to
establish a legally sufficient case.  Sheehan, 240 F.3d at
1014.  On the other hand, “[c]ircumstantial evidence will often be a
factor in these cases, for discrimination is seldom open or notorious.”  Id.
at 1013; see also Wheeler v. Marathon Printing,
Inc., 974 P.2d 207, 214 (Or. Ct. App.
1998) (“[P]roof of motivation is rarely direct
and often, necessarily, circumstantial and inferential.”).  As the
majority notes, discriminatory motive under the USERRA may reasonably be inferred
from a variety of factors, including proximity in time between the employee’s
military activity and the adverse employment action, an employer’s expressed
hostility towards members protected by the statute together with knowledge of
the employee’s military activity, and disparate treatment of certain
employees.  Ante ¶ 14.  As we recently recognized in an
analogous context in which plaintiff’s state of knowledge was in dispute,
“[t]he ultimate assessment of the inferences [to be drawn from the facts] is
for the jury rather than the court, unless reasonable minds could not differ on
the question of knowledge.”  Clarke v. Abate, 2013 VT 52, ¶ 21, ___
Vt. ___, ___A.3d ___.  


¶ 29.      
Given the record before us, I conclude that reasonable minds could well
differ on the question of whether plaintiff’s anticipated deployment was a
substantial factor in Southern State’s decisions to: (1) not promote plaintiff
and (2) subsequently terminate plaintiff’s employment.  


I


¶ 30.      
Considering the evidence in the light most favorable to plaintiff, the
record reflects the following with respect to SSCF’s decision not to hire
plaintiff as a classified corrections officer.  Before plaintiff was hired
as a temporary corrections officer (TCO), and again during his training at the
academy in December 2008 and January 2009, the Training Recruitment Coordinator
for SSCF, Kyle Beckwith, told him more than once that TCOs are hired for
full-time permanent positions with union membership and other benefits after
three-to-six months as TCOs.  Beckwith told him that this promotion was
automatic, and did not require application and interviews in front of an
interviewing board.  Another TCO hired at the same time as plaintiff
corroborated plaintiff’s testimony on this point.   


¶ 31.      
In late February and early March of 2009—within the time frame plaintiff
had been led to believe he could expect to be hired as a permanent corrections
officer—managers at SSCF identified plaintiff as one of nine correctional
officers and TCOs likely to be deployed to Afghanistan in September or October
of that year.  Managers expressed concern about the impact of the
impending deployments on SSCF correctional officer staffing, and a commitment
to being “proactive” concerning staffing as it related to upcoming deployments,
in emails that included senior SSCF leadership, including the Superintendent
and Assistant Superintendent of SSCF.    


¶ 32.      
Within two weeks of the emails identifying him as subject to deployment
in the fall, and expressing concern about the impact of correctional officer
deployments on Southern State staffing, Southern State interviewed plaintiff
for one of the three open interim correctional officer positions—classified
positions for which plaintiff had been led to believe he would be hired as a
matter of course.  The application and interview process was a departure
from what plaintiff had been led to expect in connection with his anticipated
promotion to a classified position.  Two other applicants for the
position, out of a total of eight, were also subject to deployment in the
fall.  Neither plaintiff, nor the other two soon-to-be-deployed applicants
got the job.        


¶ 33.      
After he was passed over, plaintiff discussed
his situation with Beckwith, the recruitment and training coordinator. 
Beckwith said to him, “they’re not going to give [you] a full-time benefit slot
if [you’re] leaving in eight months.”  Beckwith was not just a random
co-worker; he was the officer in charge of recruiting and training correctional
officers at Southern State.  Other officers relied on him to explain
Southern State’s personnel policies to new hires.  Moreover, the Security
and Operations Officer responsible for scheduling corrections officers, Mark
Potanas, who participated on the committee that evaluated and rated applicants
for the CO positions, acknowledged expressing his exasperation to Beckwith—the
recruitment officer—for “bringing [Patanos] more military.”  


¶ 34.      
In addition to the above, plaintiff also
presented evidence that human resource personnel at Southern State did not at
the time understand their obligations under the USERRA—a factor that lends
further support to plaintiff’s theory that in focusing on its staffing
concerns, management, insensitive to its legal obligations under federal law,
concluded that hiring plaintiff to a full-time, permanent position within
months of his anticipated deployment would not make any sense.  


¶ 35.      
The above evidence, if believed by the jury,
is sufficient to support an inference that Southern State denied plaintiff the
CO position due, in substantial part, to his anticipated deployment, thus
satisfying plaintiff’s initial burden.  As evidence in support of his
theory that Southern State did not hire him for the CO position due in part to
his anticipated deployment, plaintiff can point to his dashed expectation of
full-time, permanent employment as a corrections officer following Southern
State’s identification of plaintiff as someone facing deployment; the
contemporaneously expressed concerns of Southern State management about the
impact of deployments on correctional officer staffing; the fact that none
of the soon-to-be-deployed applicants were hired to the classified positions;
the incriminating statement by the Southern State officer tasked with
communicating many of Southern State’s personnel policies to new hires; and the
expressed exasperation with hires who have military obligations by the Security
and Operations Supervisor.  See Sheehan, 240 F.3d at 1014 (identifying temporal proximity between adverse
action and military action—in this case, anticipated deployment; expressed
hostility by management toward members protected by the statute—in this case,
soon-to-be-deployed National Guard members; and disparate treatment—in this
case, of officers facing deployment as compared to those who are not, as
factors supporting inference of discriminatory motive).


¶ 36.      
The majority does not address the allegation
that Southern State replaced its presumptive promotion of TCOs to open CO
positions with a revamped application and interview process immediately after
realizing that several TCOs who would be subject to promotions were going to be
deployed in six-to-seven months.  This is a significant factor that, if believed,
could support an inference that SSCF altered its hiring process to avoid hiring
soon-to-be-deployed military personnel for classified positions.


¶ 37.      
The majority explains away Beckwith’s
statement that plaintiff would not get a CO position given his anticipated
deployment by noting that Beckwith was not on the panel that interviewed
applicants for the CO position and made recommendations regarding hiring.[3] 
The jury ultimately may be persuaded that Beckwith’s statement does not reflect
SSCF policy, that Beckwith himself had no role in the challenged hiring
decision, and that the statement is entitled to minimal or even no
weight.  But the jury could well conclude that this statement by an
officer intimately involved with recruiting and training new officers, and with
explaining to them Southern State’s policies, reflected Southern State’s
institutional attitude.  It should be left to a jury to determine whether
Beckwith actually made the statement, whether the statement was an accurate
reflection of management attitudes at Southern State, and how much weight to
give the testimony.


¶ 38.      
The majority likewise dismisses Mark Potanas’s
expressions of frustration with the recruitment of TCOs who have military obligations
as “stray remarks,” even though Potanas was on the hiring panel for the CO
positions denied plaintiff.  In so framing the evidence, I believe the
majority has weighed evidence itself, and has drawn inferences adverse to the
plaintiff, in contravention of our summary judgment standard.


¶ 39.      
The most significant factor identified by the
majority in support of its affirmance is its view that plaintiff failed to show
that he was as qualified for the positions as those that were hired.  In
so holding, I believe the majority collapses the two-step analytical framework
applicable under the USERRA into a single step.  That is, the majority
essentially concludes that the reason plaintiff has failed to make a facial
claim is that Southern State would not have hired plaintiff anyway because he
was less qualified than the officers who were hired.  Because plaintiff
mustered sufficient evidence to support the inference that he was passed over
on the basis of impermissible discriminatory motives, the question of whether
Southern State would have declined to hire him in any event goes to SSCF’s
affirmative defense—a claim with respect to which Southern State, and not
plaintiff, bears the burden.


¶ 40.      
The majority cites substantial evidence from
which a jury could conclude that plaintiff was not among the most qualified
candidates for the CO position and would not have gotten the job even if he had
not been facing deployment.  To a large extent the majority relies on the
scores assigned through the hiring process to the respective candidates,
implicitly accepting the scores as an undisputed matter of fact entitled to
weight.  To the extent that plaintiff’s theory is that the process was
stacked against him because of his anticipated deployment, the credibility of
the interview ratings is itself very much in issue.  The facts that the
three who were hired were not facing anticipated deployment, and that the three
who were facing deployments were not hired, could support plaintiff’s inference
that the deck was stacked.  By the same token, the fact that the three
TCOs scheduled for deployment in the fall received the three lowest subjective
ratings in the interview process likewise supports plaintiff’s theory of the
case, rather than Southern State’s claim that the three to-be-deployed TCOs
were the least qualified.  Moreover, plaintiff has mustered evidence of
his own that undermines the suggestion that Southern State’s evidence
establishes its affirmative defense as a matter of law.  As noted above,
plaintiff presented evidence of positive reviews and scores during his training
and positive performance reviews.  Given the above evidence, I cannot
conclude that, as a matter of law, the only legally permissible inference is
that Southern State’s hiring decision was non-pretextual and unaffected by
plaintiff’s imminent deployment.  


II


¶ 41.      
Plaintiff’s second claim is that after he was
passed over, Southern State management began making his life more difficult and
disciplining him for things for which others were not disciplined, and
ultimately terminated him following an incident that did not warrant
termination.  First, he presented evidence that he was scheduled for
strenuous “3-2-1” schedules, which entail working a third shift (10:00 p.m. to
6:00 a.m.) followed immediately by a second shift (2:00 p.m. to 10:00 p.m.)
followed by a first shift (6:00 a.m. to 2:00 p.m.).  Given his significant
commute, this was a particularly challenging schedule.  Second, he
presented evidence that he was disciplined for being late on two occasions,
when other officers are not always written up for similar tardiness. 
Third, and most significant, he presented evidence that he was disciplined for
allowing an inmate to go through a door to get to class at the request of a
case worker during a head count; plaintiff testified that his on-the-job
trainer had told him this was appropriate and had done the same thing while
training plaintiff.  This incident triggered his termination.  It
also occurred at about the same time as a few more CO positions were opening
up, for which TCOs such as plaintiff would be eligible to apply.


¶ 42.      
Again, a jury could well consider all of this
evidence and conclude that plaintiff’s termination was not related to his
anticipated deployment and was not pretextual.  But in light of the
evidence cited above, which is sufficient to make out a legal claim on its
face, plaintiff is entitled to a determination by a jury, not the court.  Clarke,
2013 VT 52, ¶ 21.  


¶ 43.      
For the foregoing reasons, I respectfully
dissent.


 



 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 Associate Justice

 

  














[1]
 As the high court in Staub explained, the term “cats paw” derives
from an Aesop’s fable in which a monkey induces a cat by flattery to extract
roasting chestnuts from a fire.  131 S. Ct. at 1190 n.1.     







[2] 
This apparent policy concerning TCOs never actually applied to plaintiff
because he was terminated before deployment.  Nor is it self-evidently
inconsistent with the USERRA, under which service-member employees must notify
their employer of their intent to return to employment or reapply for employment. 
38 U.S.C. § 4312(a) (stating that “any person
whose absence from a position of employment is necessitated by reason of
service in the uniformed services shall be entitled to the reemployment rights
and benefits and other employment benefits of this chapter
if . . . the person reports to, or submits an application
for reemployment to, such employer in accordance with the provisions of
subsection (e)”); id. § 4312(e) (listing circumstances and corresponding
timeframes for reporting or employment reapplication process).







[3] 
The majority likewise dismisses the significance of a shift supervisor’s
comment to another soon-to-be-deployed TCO who was passed over like plaintiff:
“The reason you are not getting promoted is because you are getting
deployed.  It’s common knowledge.”